**KELLER BENVENUTTI KIM LLP**
TOBIAS S. KELLER (Cal. Bar No. 151445)
(tkeller@kbkllp.com)
DARA L. SILVEIRA (Cal. Bar No. 274923)
(dsilveira@kbkllp.com)
650 California Street, Suite 1900
San Francisco, California 94108
Telephone: (415) 364-6793
Facsimile: (650) 636-9251

BRETT M. SCHUMAN (SBN 189247)
*bschuman@goodwinlaw.com*
RACHEL M. WALSH (SBN 250568)
*rwalsh@goodwinlaw.com*
**GOODWIN PROCTER LLP**
Three Embarcadero Center
San Francisco, California 94111
Tel.: +1 415 733 6000
Fax.: +1 415 677 9041

HONG-AN VU (SBN 266268)
*hvu@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Flr.
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Plaintiff and Debtor and
Debtor in Possession Anthony S. Levandowski

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>ANTHONY SCOTT LEVANDOWSKI,<br><br>      Debtor. | Bankruptcy Case<br>No. 20-30242 (HLB)<br>Chapter 11 |
| ANTHONY LEVANDOWSKI, an individual,<br><br>      Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC.<br><br>      Defendant. | **Adv. Pro. No. 20-03050 HLB)**<br><br>**DEBTOR'S FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, SPECIFIC PERFORMANCE, AND DAMAGES; AND OBJECTION TO CLAIM** |

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

FIRST AMENDED COMPLAINT

Case: 20-03050  Doc# 49  Filed: 09/28/20  Entered: 09/28/20 17:06:06  Page 1 of 44

Anthony Levandowski, as debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), and as plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), alleges in this First Amended Complaint upon knowledge of his own acts and upon information and belief as to other matters, as follows:

## NATURE OF CLAIM

1. This is an objection to the allegations made by Uber Technologies, Inc. ("Uber") in its Proof of Claim (Claim 8-1) filed on July 6, 2020 (the "Proof of Claim") and an action to enforce the promises Uber made to Mr. Levandowski to induce him to sell to Uber his self-driving companies and technology and to lead its autonomous vehicle program.

2. Mr. Levandowski is one of the world's leading experts in autonomous vehicle technology. Mr. Levandowski is a star engineer who built one of the first self-driving motorcycles (which is in the Smithsonian today), one of the first self-driving cars, and one of the first self-driving freight trucks. He was a founding member of Google's autonomous car initiative, Project Chauffeur, and played an integral part in driving the technology development for Project Chauffeur.

3. Before his departure, Mr. Levandowski told Google about his intention to leave Google to start a new self-driving start-up.

4. Larry Page, the then-CEO of Google, threatened Mr. Levandowski and stated that if Mr. Levandowski worked for a competitor on self-driving technology, he would face very negative consequences. Mr. Levandowski was also aware that Mr. Page had great animosity toward Uber and Travis Kalanick, Uber's then-CEO. In addition, Mr. Levandowski was aware that Mr. Page and other executives at Google viewed Uber as a very significant competitor.

5. In early 2016, Mr. Levandowski left Google and helped start Ottomotto LLC ("Otto") a self-driving trucking company.

6. Uber expressed an interest in acquiring Otto to accelerate its self-driving program and to compete with Google, whom Mr. Kalanick believed to be an existential threat to Uber.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

7. Because of Mr. Page's threats and known hostility towards Uber, Mr. Levandowski insisted that Uber indemnify him against claims that may be brought by Google as a condition to entering into any relationship with Uber.

8. In fact, Mr. Levandowski explained to Uber multiple times that he believed Google would likely sue him if he joined Uber. Mr. Levandowski was particularly concerned because he did not have the ability to defend himself if one of the largest companies in the world, with essentially unlimited resources, came after him.

9. In addition, because Mr. Levandowski left Google to work on autonomous trucking, Mr. Levandowski conditioned the sale of Otto on Uber supporting his self-driving trucking business.

10. As part of the transaction for the acquisition of Otto, Uber agreed to indemnify Mr. Levandowski for claims Google might raise against him. These claims included claims Google might assert for breach of fiduciary duty, breach of the duty of loyalty, breaches of various restrictive covenants, and trade secret misappropriation. **Exhibit A** is a redacted copy of the Indemnification Agreement dated April 11, 2016 between Uber and Mr. Levandowski.

11. Under the Indemnification Agreement, Uber agreed to pay for Expenses incurred by Mr. Levandowski—defined in the Agreement to include attorneys' fees and costs relating to defense of any claim brought by Google, as well as any award or judgment in Google's favor. *See* Ex. A at 3, § 2.3.

12. As part of the acquisition of Otto, Uber also agreed to support Mr. Levandowski's trucking business objectives by either creating a new business unit within Uber (wherein Mr. Levandowski would have a leadership role) or allowing Mr. Levandowski to create a trucking business outside of Uber.

13. After Uber acquired Otto, Mr. Page followed through on his threats against Mr. Levandowski. In October, 2016, Google initiated two arbitration proceedings against Mr. Levandowski. Mr. Levandowski timely requested indemnity from Uber under the Indemnification Agreement, and Uber accepted its obligations. Consequently, Uber paid for and controlled the defense of Mr. Levandowski for nearly three years. Initially, Mr. Levandowski

was represented by the same counsel that represented Uber.  During the course of a separate litigation, a trade secrets dispute with Waymo LLC, a Google affiliate, Uber's then-counsel determined it could not jointly represent Mr. Levandowski (or his company, Otto Trucking) and Uber.  Uber subsequently selected and hired separate counsel for Mr. Levandowski.  Uber continued to direct the defense strategy and continued to make payments for the cost of defense after replacement counsel was selected.  Uber also exercised its right to direct and control Mr. Levandowski's defense of the arbitration proceeding through the final award and including all settlement discussions with Google.

14.     After Mr. Levandowski relied on Uber's control and direction for years and after an unfavorable Interim Award issued, Uber purported to rescind the Indemnity Agreement and made clear that it would not pay for any additional Expenses incurred by Mr. Levandowski after September 25, 2016.

15.     In addition, while in control of Mr. Levandowski's defense and settlement prospects with Google, Uber worked out its own settlement with Google's subsidiary, Waymo LLC ("Waymo") to resolve a trade secret dispute between them relating to the same underlying events.  Upon information and belief, the terms of that settlement included an agreement that Uber would never hire or work with Mr. Levandowski again, which resulted in Uber also reneging on its promises to support Mr. Levandowski's trucking business.

16.     Uber's recently filed Proof of Claim has made the Indemnification Agreement, and Uber's actions related to its acquisition of Otto, central to this Chapter 11 Case.

17.     In particular, the Proof of Claim alleges that because Uber purportedly rescinded the Indemnification Agreement, not only does Uber not have any obligation to indemnify Mr. Levandowski but it also is a creditor of Mr. Levandowski.  Uber seeks payment for legal fees and costs it provided under the Indemnification Agreement and contribution for the settlements it has negotiated for its own benefit and the benefit of Mr. Levandowski's cofounder, the current lead of Uber's trucking business.

18.     However, Uber asserts claims that, upon information and belief, Uber released as part of the settlement with Waymo.

19.     Uber also has no basis to rescind the Indemnity Agreement.  Uber has set forth numerous theories to back out of the deal it struck, but two issues appear to be core: (1) a claim that Mr. Levandowski engaged in fraud and (2) a claim that Mr. Levandowski has pled to one count of trade secret misappropriation in a criminal indictment filed by the United States Attorney.

20.     First, there was no fraud.  Uber was aware of Mr. Levandowski's conduct through the extensive investigation it conducted prior to and after entering into the indemnity agreement with him, and long before it purported to rescind.  To the extent Uber claims it was unaware of certain facts, those facts were not material and were fully available to Uber had they cared to look more carefully at the materials it was provided by Mr. Levandowski.  In fact, Mr. Levandowski repeatedly told Uber to search those devices for the most accurate information.

21.     Second, Mr. Levandowski did not make any misrepresentations regarding any theft of trade secrets.  Mr. Levandowski has plead guilty to trade secret misappropriation with respect to one file he accessed after leaving Google.  As for that one file, Uber knew the file's name, that Mr. Levandowski kept that file, that he accessed it after he left Google, the date he accessed it, and through its due diligence firm, the contents of that file.

22.     Mr. Levandowski therefore commenced the Adversary Proceeding to obtain declaratory relief as to the impact of Uber's purported rescission on the parties' respective rights and obligations, to enforce Uber's obligations arising from the Otto transaction, and to disallow the Proof of Claim.

## JURISDICTION AND VENUE

23.     The Adversary Proceeding arises in and relates to the Chapter 11 Case.  The Court has jurisdiction to consider the Adversary Proceeding and the claims asserted by Mr. Levandowski against Uber herein pursuant to 28 U.S.C. §§ 157 and 1334; the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.); and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California.  The parties also stipulated to have this dispute, and any

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

5

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 5 of 44

others raised in Mr. Levandowski's arbitration demand and Uber's proof of claim be resolved in this Adversary Proceeding. *See* ECF No. 13.

24.     This is a core proceeding under 28 U.S.C. § 157(b) including, without limitation, under subsections (b)(2)(A), (B), (C), (K), and (O).  Mr. Levandowski consents to the entry of a final order by the Court in connection with this Adversary Proceeding.

25.     Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

### A.     MR. LEVANDOWSKI ESTABLISHES HIS REPUTATION AS A PIONEER IN SELF-DRIVING CAR TECHNOLOGY

26.     Mr. Levandowski has had a lifelong fascination with robots and autonomous devices.

27.     He earned his undergraduate and graduate degrees in Industrial Engineering and Operations Research at University of California, Berkeley ("U.C. Berkeley").

28.     In 2004, Mr. Levandowski participated in the Defense Advanced Research Projects Agency's ("DARPA") Grand Challenge, a prize competition for autonomous vehicles. He was 24 years old at the time.

29.     The DARPA Grand Challenge was an effort to race robotic, computer-controlled vehicles between Los Angeles and Las Vegas.  Mr. Levandowski and a team of engineers from U.C. Berkeley—working in Mr. Levandowski's garage using crowd-sourced donations— submitted a self-driving, self-balancing, two-wheeled motorcycle.  This motorcycle, Ghostrider, competed against well-funded submissions from Stanford University, Carnegie Mellon, and established companies.  After performing well in several qualifying rounds, Ghostrider was selected as a contender for the DARPA Grand Challenge.

30.     Ghostrider now sits in the Smithsonian Museum as one of America's great innovations.

31.     Mr. Levandowski's Ghostrider entry caught the attention of many, including Dr. Sebastian Thrun, a former Stanford computer science professor who was also a participant in the DARPA Grand Challenge.

32.     Dr. Thrun recruited Mr. Levandowski to work for his mapping company, VuTool. VuTool was subsequently acquired by Google.

**B.     MR. LEVANDOWSKI BUILDS GOOGLE'S SELF DRIVING CAR PROGRAM**

33.     Mr. Levandowski joined Google in 2007 as part of a team hired to work on mapping with Dr. Thrun.  Mr. Levandowski helped develop the technology for the Google service now known as Street View.

34.     In approximately 2009, Dr. Thrun and Mr. Levandowski decided to launch a self-driving car program at Google.  The program was named "Project Chauffeur."

35.      Project Chauffeur catapulted Google into the lead in autonomous driving when, in 2010, cars using Google's self-driving technology were able to drive ten uninterrupted routes of 100 miles.  By 2012, Google had logged over 300,000 miles of autonomous driving.  Mr. Levandowski was a key contributor in helping Google achieve these milestones.  For his past contributions and to incentivize him going forward, Google invited Mr. Levandowski to participate in the Chauffeur Bonus Plan—an incentive plan that would pay members a percentage of the valuation of Project Chauffeur starting at the end of 2015—and gave him the highest initial allocation or individual earnout percentage of any member of the plan.

36.     Mr. Levandowski was an instrumental contributor to Project Chauffeur until he left Google in early 2016.

37.     Mr. Levandowski would ultimately be paid over $127 million by Google for his work on Project Chauffeur.  The majority of that payment came in December 2015 and then in mid-August 2016, after Mr. Levandowski left Google.

**C.     MR. LEVANDOWSKI CONSIDERS LEAVING GOOGLE**

38.     For years, Google enjoyed its position as the leader in the self-driving space with no significant challengers.  In 2015, Uber announced the launch of its own self-driving car initiative after acquiring a team of engineers from Carnegie Mellon University.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

7

39.     After Uber's announcement, there were many discussions within Google about how to compete with Uber. In those discussions, executives within Google expressed distaste and animosity towards Uber. Larry Page, one of Google's founders and its then-CEO, was one of the individuals expressing such views.

40.     Uber's founder and then-CEO, Travis Kalanick, testified that after Uber announced its entry into self-driving, Mr. Page communicated directly to Mr. Kalanick his displeasure about the increased competition:

> So when we acquired the [Carnegie] team and we were eventually -- we acquired it because we couldn't get meetings [with Google] and we couldn't figure out if they were still up for partnering. When we finally got the meeting, Larry made it very clear that he was very upset with us and not happy that we were doing autonomy. And everything we would get in terms of a signal from other people who knew him or knew people around him was that generally Google was super not happy, unpumped, about us doing this. And so when you go and hire a group of people, a large group of people, acquire a company where a large group of people, you know, come from there, you know, that competitive thing, those competitive juices get flowing, and that means there is a higher likelihood of a lawsuit of some kind.

**Exhibit B** is an excerpt from Mr. Kalanick's trial testimony in *Waymo LLC v. Uber Technologies, Inc.* (Kalanick Waymo 2/7/2018 trial testimony) at 717:4-17.

41.     Over time, Mr. Levandowski became increasingly dissatisfied with the direction of Project Chauffeur and the slow progress it was making after its initial successes. In 2015, Mr. Levandowski began to think about other self-driving opportunities.

42.     After learning about Mr. Levandowski's discontentment at Google, Dr. Thrun introduced Mr. Levandowski to Mr. Kalanick at Uber. Upon meeting Mr. Levandowski, Uber repeatedly tried to recruit Mr. Levandowski and also encouraged him to leave Google to form a commercial partnership where he could supply self-driving technology to Uber as an outside technology vendor.

43.     Mr. Levandowski's Google colleagues, and more than one of his superiors, were aware that Mr. Levandowski was having discussions with Uber as he considered his future.

44.     Simultaneously, in 2015, Lior Ron rejoined Google in a business role. Mr. Levandowski and Mr. Ron, who had met while working on Google Maps, began to discuss the problems with Project Chauffeur and ways in which the Project could be improved.

45.     During those conversations, they also discussed new product markets, including self-driving trucks.  As they explored this concept and brainstormed further, both became passionate about self-driving trucking.  They were convinced that the trucking business could be disrupted by the addition of self-driving technology and that self-driving trucking technology could go to market much more quickly than passenger car technology.  Mr. Levandowski began to include Mr. Ron in his discussions with Uber and others.  Mr. Levandowski and Mr. Ron considered establishing a commercial vendor relationship with Uber to obtain funding for the trucking business.

46.     Toward the end of his time at Google, Mr. Levandowski also had several discussions with Mr. Page about his dissatisfaction with Project Chauffeur.  During one of these discussions, Mr. Levandowski told Mr. Page that he wanted to create his own self-driving start-up outside of Google.

47.     Mr. Page responded that if Mr. Levandowski did anything competitive with Google, he would face negative consequences.  Because Google had bought several of Mr. Levandowski's outside businesses previously and because others had left Google to start new companies without objection from Google, Mr. Levandowski understood Mr. Page's threat to be about a large, well-funded competitor and not a startup.

**D.     MR. LEVANDOWSKI JOINS UBER AND OBTAINS INDEMNITY AGAINST CLAIMS GOOGLE MAY RAISE**

48.     Mr. Levandowski left Google on January 27, 2016.  He joined Otto, a self-driving trucking company and was credited as a co-founder.

49.     Soon after Mr. Levandowski joined Otto, Uber pushed for discussions to acquire Otto.

50.     As part of these discussions, Mr. Levandowski repeatedly told Uber that Google would see Mr. Levandowski working with Uber on consumer self-driving technology (instead of trucking) as a competitive act that would convert him from a friendly, start-up competitor to an enemy.  Mr. Levandowski also told Uber that he feared that Google would sue him and seek

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

recovery of the substantial amounts of money that had been paid to him or were owed to him, in particular, the proceeds from the Chauffeur incentive plan that Google owed him.

51.     In total, he had over a dozen conversations with executives at Uber about his concerns, including multiple conversations with Mr. Kalanick.  In particular, Mr. Levandowski discussed the possibility that Google might sue him, Mr. Page's aggressiveness with competitors, and Mr. Page's dislike of Mr. Kalanick.  In response, Mr. Kalanick stated that Uber was prepared to protect Mr. Levandowski from an aggressive assault by Google.

52.     As a key and indivisible part of the transaction to sell Otto to Uber and have Mr. Levandowski join Uber, Uber agreed to indemnify Mr. Levandowski against any claims Google might assert against him.  *See* Ex. A.  The goal of the Indemnification Agreement was to indemnify Mr. Levandowski and others for "Pre-Signing Bad Acts," which were defined as any of the following acts that occurred prior to April 11, 2016:

> "Bad Acts" shall mean (a) fraud committed by or on behalf of any member of the Company Group and/or committed by any Employee, (b) willful, intentional or deliberate conduct by an Employee or any member of the Company Group that constitutes or directly leads or contributes to the infringement (direct or indirect) or misappropriation by an Employee or any member of the Company Group of any patents, copyrights, trademarks or trade secrets of such Employee's Former Employer, including, without limitation, taking, removing and/or copying software, product plans, or invention disclosures, in electronic or tangible form that are owned by such Employee's Former Employer, (c) willful and/or intentional breach by any member of the Company Group or any Employee of any fiduciary duty or duty of loyalty to such Former Employer and/or (d) willful and/or intentional breach by any member of the Company Group or any Employee of any lawful and enforceable non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between any Employee and such Employee's Former Employer.

> "Pre-Signing Bad Acts" means any Bad Act committed prior to the Agreement Date.

*Id.* at 1-2, 3 (definition of "Bad Acts" and "Pre-Signing Bad Acts").

53.     Section 2.1 outlined the scope of the indemnity for these Pre-Signing Bad Acts:

> (a) ***Purchaser will indemnify and hold harmless each Diligenced Employee*** and the Company Group, ***to the maximum extent permitted by applicable Law*** (subject to the limitations and exclusions set forth herein), from and against any and ***all Expenses incurred by such Diligenced Employee*** or any member of the Company Group, as applicable, arising out of any claim brought or threatened in writing by any Former Employer of such Diligenced Employee against any member of the

10

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Company Group or such Diligenced Employee, as applicable, arising out of or alleged to arise out of: (i) the infringement (direct or indirect) or misappropriation by such Diligenced Employee or any member of the Company Group of any intellectual property, including any patents, copyrights, trademarks or trade secrets, of such Diligenced Employee's Former Employer, (ii) breach by such Diligenced Employee of such Diligenced Employee's fiduciary duty or duty of loyalty to such Diligenced Employee's Former Employer, and/or (iii) breach by such Diligenced Employee of any non-solicitation, non-competition, confidentiality or other similar restrictive covenant or agreement between such Diligenced Employee and such Diligenced Employee's Former Employer (each, subject to Section 2.1(b) below, an "Indemnified Claim", and, collectively, the "Indemnified Claims")

*Id*. at § 2.1(a) (emphasis added).

54. "Expenses" is defined in the Indemnification Agreement to include, among other costs, reasonable attorneys' fees, costs of defense, any judgments, awards or damages, and interest incurred:

"Expenses" means (a) any expense, liability, or loss, including reasonable attorneys' fees, mediation fees, arbitration fees, expert witness fees, vendor fees, costs (such as witness fees, duplication charges, data storage fees, filing fees, travel and meals), (b) any judgments, fines, bonds, penalties, damages, awards, and amounts paid or to be paid in settlement, and (c) any interest, assessments, taxes or other charges imposed on any of the items in part (a) and (b) of this definition, in each case, that is out-of-pocket and documented; provided, that Expenses shall exclude special, consequential, indirect, exemplary or punitive damages, unless such Expenses were specifically awarded in a Final Judgment.

*Id.* at 3.

55. The only limitations on Uber's indemnification obligations with respect to "Pre-Signing Bad Acts" are found in Section 2.1(b)(ii). That section reads:

(b) Notwithstanding anything herein to the contrary, ***an Indemnified Claim shall not, regardless of whether the Closing occurs, include***, and none of Parent, Purchaser or any of their respective Affiliates shall have any obligation hereunder to indemnify the Company Group or any Diligenced Employee in respect of, any:

(ii) ***claims that have been determined by a Final Judgment to arise or result from any Pre-Signing Bad Acts*** committed by or on behalf of any member of the Company Group by a Diligenced Employee and/or committed by any Diligenced Employee that reasonably arise or result from any facts, circumstances, activities or events arising prior to the date hereof that ***either (A) were not truthfully disclosed by the Diligenced Employees to the Outside Expert in response to relevant inquiries*** in connection with the due diligence performed by the Outside Expert ***or (B) were not contained or reflected in the due diligence materials provided by the Diligenced Employees*** to the Outside Expert.

*Id.* at § 2.1(b)(ii) (emphasis added).

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

56.     The Indemnification Agreement was structured to ensure that Mr. Levandowski would not be left unprotected against Google, which had inexhaustible resources to attack Mr. Levandowski.  Mr. Levandowski would not have entered into the transaction to sell Otto to Uber without Uber's indemnity promise.

57.     The Indemnification Agreement was structured so that Uber would indemnify Mr. Levandowski first and could only seek recovery from him for Expenses improperly paid (if any) after any matters initiated by Google had concluded.  Under Section 2.3 of the Indemnification Agreement, the parties specified a procedure by which Mr. Levandowski would notify Uber about Expenses and receive payment.

> **2.3. Expenses**
> (a) Upon receipt of a written request for the advancement of Expenses incurred by an Indemnified Person arising out of any Indemnified Claim and reasonable documentation evidencing such Expenses, Purchaser shall pay, or cause to be paid, to such Indemnified Person the amount of such Expenses within [redacted] of such request.

*Id.* at § 2.3.

58.     If Uber denied a request for advancement of Expenses or otherwise failed to pay an Expense, Uber agreed that Mr. Levandowski could initiate arbitration proceedings to enforce Uber's obligations or seek specific performance of Uber's obligations.  Ex. A at §§ 2.3, 3.11

59.     The parties also agreed that Mr. Levandowski could pursue specific performance in the event Uber refused to advance Expenses, including proceedings in San Francisco state or federal courts where both parties submitted to jurisdiction.

> **3.11 Specific Performance**. Except as set forth in this Agreement, the rights and remedies of the Parties specified shall be cumulative (and not alternative).  Each of the Parties agrees that ***this Agreement is intended to be legally binding and specifically enforceable*** pursuant to its terms and that Purchaser and the ***Indemnified Persons would be irreparably harmed if any of the provisions of this Agreement are not performed in accordance with their specific terms*** and that monetary damages would not provide adequate remedy in such event. Accordingly, in addition to any other remedy to which a nonbreaching Party may be entitled at law, ***a non-breaching Party shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to specifically enforce the terms and provisions hereof.***

*Id.* at § 3.11 (emphasis added); *see also id.* at § 3.5.

## E.    UBER ACQUIRES OTTO

60.    As part of the indemnification process, Mr. Levandowski agreed to be interviewed by Uber's due diligence and risk management firm, Stroz Friedberg, LLC ("Stroz"). He also provided over 35 of his devices and gave access to over ten email and other types of accounts to Stroz for examination. To this day, Uber, through Stroz, continues to be in possession of Mr. Levandowski's devices (other than his cell phone at the time) and images of his accounts.

61.    The Stroz /Uber investigation of Mr. Levandowski uncovered a great number of facts related to potential claims that might be brought by Google but was, by Stroz's own admission, incomplete. In early April 2016, while Stroz' was conducting its investigation, Uber executed the Indemnification Agreement.

62.    As Stroz summarized, Uber requested preliminary information regarding the investigation "in the lead-up to Uber's signing of an agreement to purchase Otto and "long before the investigation was completed." Stroz had provided Uber with preliminary information that included Stroz's draft memo from Mr. Levandowski's interviews and access reports showing that Mr. Levandowski retained thousands of Google files, and had accessed hundreds of Google documents after he left Google, including several that were identified by Mr. Levandowski as relating to self-driving. The interview memo remained in draft form and Mr. Levandowski's counsel reserved his rights as to the accuracy of the information in the memo.

63.    The Stroz draft interview memo contained nine pages of summaries of Mr. Levandowski's interactions and discussions with Google employees about his plans to start a company outside of Google, including summaries of one-on-one discussions and larger gatherings at his house.

64.    Uber pushed for the entire transaction to proceed to closing knowing that Stroz had not completed its investigation.

65.    On April 11, 2016, Uber executed several documents to complete this transaction, including the Indemnification Agreement, the Otto Agreement and Plan of Merger (the "Otto Agreement"), and the Otto Trucking LLC Agreement and Plan of Merger (the "Otto Trucking

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 13 of 44

Agreement"), which gave Uber an option to acquire a second company created by Mr.

Levandowski and Mr. Ron.

66. Stroz did not issue a report until August 5, 2016, almost four months after it signed

the Otto acquisition documents.

67. The Stroz report disclosed numerous facts, including the following:

During his interview, Levandowski informed Stroz Friedberg that he: (a) possessed Google information; (b) met with a number of Google employees about joining his start-up company; (c) met with Uber executives, while employed at Google, about forming a new company; and (d) destroyed highly confidential Google proprietary information he had stored on five disks on his personal Drobo 5D, including source code, files, and software pertaining to self-driving cars.

68. Stroz reported that Mr. Levandowski's devices demonstrated that during his time

at Google, he downloaded documents and files relating to Project Chauffeur.

Stroz Friedberg's analysis also identified relevant files that were accessed on Levandowski's personal laptop and subsequently deleted between September 1, 2015 and March 22, 2016. An example of this activity includes system logs indicating that on December 14, 2015, approximately 24,000 files were located within the folder path "/Users/Anthony/Desktop/boards/chauffeur-svn/." These same system logs indicate that on December 14, 2015, approximately 24,000 files were located within the folder path "/users/Anthony/.Trash/boards/chauffeur-svn/." A review of the names of the deleted files indicates that they were source code and electronic design files relating to driverless cars.

69. It also reported that Mr. Levandowski downloaded Chauffeur files shortly before

his departure from Google and had accessed them following his departure from Google.

Stroz Friedberg also identified access by Levandowski to several cloud storage repositories. A review of the internet history shows access to Google Docs on January 26 2016, the day of Levandowski's resignation. In particular, he accessed a file named "Chauffeur TL weekly updates - 04 2015 – Google Sheets." Further review of the laptop identified a file with the same name in Levandowski's Downloads folder, which is attached as Exhibit 27. The file was created on January 1, 2016 and last accessed on February 24, 2016 (about a month after his departure from Google).

70. Stroz reported facts regarding hiring of Google employees.

While employed at Google, Levandowski had a number of one-on-one meetings and four group meetings with several Google/Chauffeur employees about joining his start-up company. The one-on-one meetings occurred at work with over 20 Google/Chauffer employees (during individual update meetings or around the Google campus), coffee shops, restaurants, homes, or telephonically. There were also four group meetings, two of which occurred with small groups of Google and/or Chauffeur employees at a barbeque at Levandowski's house and on a ski trip to Lake Tahoe. Two larger group meetings took place at Levandowski's house in

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

approximately December 2015 and January 2016. These meetings included approximately 15 to 20 Google and non-Google employees. . . .

Offers of employment were made to at least 15 Chauffeur team employees by Levandowski and/or his Ottomotto team before and after his departure from Google. According to Levandowski, as of the dates of his interview on March 22 and March 23, 2016, Ottomotto had approximately 30 employees, 16 of whom were former Google employees.

71.     Stroz included as an exhibit to its report the draft memorandum of its interview with Mr. Levandowski, which included a list of some of his side projects for which he had an ownership interest, but did not include any discussion of this memo in its main report. In addition, Mr. Levandowski's devices and accounts also contained extensive information about a company named Odin Wave/Tyto, Mr. Levandowski's estate planning, and various investments.

72.     Stroz noted discrepancies in what Mr. Levandowski recalled and what Stroz discovered on Mr. Levandowski's devices.

Our forensic examination of Levandowski's devices and accounts corroborates his assertion that he stored and accessed Google files on his personal laptop in folders labeled "Chauffeur" and "Google." However, contrary to his belief that there were no or few Google e-mails on his laptop, Stroz discovered approximately 50,000 Google work e-mail messages that were downloaded onto Levandowski's computer on September 20, 2014. Ten of those e-mails were last accessed between September 1, 2015 and January 28, 2016. It is difficult to believe that Levandowski was not, prior to his interview, fully aware of the extent of the data that he had retained.

73.     Stroz also called to Uber's attention Mr. Levandowski's deletion of files and text messages, as well as its decision not to investigate these deletions further.

Many of these deletions may have been good faith attempts by Levandowski to purge retained Google material from his devices in accordance with his obligation not to retain confidential Google data. However, by March 2016, Levandowski was aware that Stroz Friedberg was going to implement a process to preserve, identify, and potentially remediate retained Google material from his devices. At that point, the better course would have been to let that process control. In addition, there was an effort by Levandowski and his Ottomotto colleagues to delete texts in real time. Stroz Friedberg did not re-interview Levandowski or others regarding their reason for this practice.

74.     Despite and with full knowledge of Stroz's findings, on August 18, 2016, Uber closed the acquisition of Otto and publicly announced that it was acquiring the company and working with Mr. Levandowski.

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 15 of 44

75.     In that press release, Uber touted Mr. Levandowski's skills and experience, calling him "one of the world's leading autonomous engineers" and a "prolific entrepreneur with a real sense of urgency."  Uber further stated that it now had "one of the strongest autonomous engineering groups in the world [and] self-driving trucks and cars that are already on the road thanks to Otto and Uber's Advanced Technologies Center in Pittsburgh."  **Exhibit C** is a true and correct copy of Uber's August 18, 2016 press release found at https://www.uber.com/en-FR/newsroom/rethinking-transportation-2/.

### F.     GOOGLE INITIATES ARBITRATION AGAINST MR. LEVANDOWSKI

76.     On October 28, 2016, nine months after Mr. Levandowski resigned from Google and only two months after Uber announced its acquisition of Otto, Google filed and served two arbitration demands on Mr. Levandowski alleging breach of fiduciary duty, breach of his employment agreements relating to misuse of confidential information, violation of his nonsolicitation obligations, and breach of other noncompetition and nonsolicitation obligations. **Exhibit D** contains true and correct copies of Google's arbitration demands without exhibits.

77.     Although alleging breach of different agreements and/or duties, both arbitration demands focused on the same set of underlying, and as the later arbitration panel determined, "interrelated" facts.

78.     The two arbitration demands involved facts concerning Mr. Levandowski's dealings with an entity named "Odin Wave" (later renamed "Tyto LiDAR" or "Tyto") and the formation of Otto, which later acquired Tyto before Otto was acquired by Uber.

79.     Google alleged that Mr. Levandowski violated his duties to Google through his relationship with Tyto.  Google also alleged that Mr. Levandowski breached his obligations to Google by forming Otto, soliciting Google employees to join Otto and eventually Uber, and using confidential information regarding compensation to recruit Google employees.

80.     The claims asserted by Google were the precise types of claims covered by the Indemnification Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050     Doc# 49     Filed: 09/28/20     Entered: 09/28/20 17:06:06     Page 16 of 44

## G. UBER ACCEPTS THE INDEMNITY OBLIGATIONS

81. On November 3, 2016, Mr. Levandowski promptly provided notice to Uber of these Former Employer Claims pursuant to the requirements of the Indemnification Agreement.

82. On November 3, 2016, Uber's in-house counsel and as its outside counsel from Morrison & Foerster LLP ("MoFo"), Eric Tate, interviewed Mr. Levandowski about the allegations asserted in Google's arbitration demands.

83. After receipt of the notice and interviewing Mr. Levandowski, Uber accepted Mr. Levandowski's tender of the indemnity (even though Uber's outside counsel stated that he was concerned that not everything alleged in the arbitration demands was covered in the Stroz due diligence) and assumed control of Mr. Levandowski's defense.

84. Uber hired MoFo to initially represent Mr. Levandowski. Through its counsel, Uber controlled the strategy for Mr. Levandowski's defense, including deciding to consolidate the two arbitrations, initiating counterclaims, filing Mr. Levandowski's answer, alleging affirmative defenses, and dealing with procedural matters relating to the arbitration.

85. In February 2017, Waymo LLC ("Waymo")—the entity Project Chauffeur became after a corporate restructuring—initiated an action in the Northern District of California for misappropriation of trade secrets and patent infringement against Uber (the "Waymo Action"). That action alleged, among other things, that Mr. Levandowski had downloaded 14,000 files from a Google server, that those files contained trade secrets, and that he had used those files at Otto, which was acquired by Uber in 2016. These were the same files that Stroz had noted in its report, except that because Mr. Levandowski had downloaded the repository multiple times over his time at Google, Stroz had identified 24,000 files from that server.

86. Based on Waymo's allegations, MoFo notified Google that Mr. Levandowski was invoking his Fifth Amendment rights and would not make disclosures in the arbitration.

87. Several weeks after, MoFo determined it had a potential conflict of interest in jointly representing Uber and Mr. Levandowski. As a result, MoFo sought to withdraw from representation of Mr. Levandowski and continue with its representation of Uber.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 17 of 44

88.     Uber hired Goodwin Procter to separately represent Mr. Levandowski in the arbitration, but continued to control his defense.

89.     For the next year, Uber continued to pay for Mr. Levandowski's legal defense as required by the Indemnification Agreement.  Uber also continued to direct and control Mr. Levandowski's defense, requiring updates on the proceedings, approval over experts, discussion about who would be arguing motions, pre-approval of submissions to the arbitration panel, and insisting on handling all settlement discussions.  Mr. Levandowski complied with Uber's requirements and cooperated with his defense.  Mr. Levandowski and his counsel met with Uber whenever it requested.

90.     Mr. Levandowski provided information and guidance that led to the discovery of evidence that was helpful to his defense in the arbitration as well as the Waymo action.  This included guidance that led to the discovery of statements by the administrator of the server that housed the 14,000 files at issue that the files were "low value" and that "checking out" or downloading the entire repository of 14,000 files did not "ring the alarm bells" for him.  This was because when a user accessed the server where the so-called 14,000 files were located, the system automatically downloaded the entire repository onto his or her laptop even if the user only wanted to access one or two files.  Ultimately, this discovery, driven by Mr. Levandowski's contributions, became a centerpiece of Uber's defense in the Waymo case.

91.     In addition to providing this critical information, Mr. Levandowski also provided additional information to support Uber's defense. This included obtaining from a former Chauffeur team member the earrings she received as a parting gift that contained the alleged trade secrets at issue in the Waymo Action.  Mr. Levandowski also identified numerous events and witnesses who aided Uber in its defense of the Waymo action as well as the arbitration with Google.

92.     Mr. Levandowski also complied with Uber's requirement that Uber control all settlement discussions with Google.  Mr. Levandowski made several proposals regarding possible settlement structures to Uber hoping that a global settlement could be reached with

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

First Amended Complaint

Google.  But because Uber controlled settlement prospects with Google, Mr. Levandowski did not know whether any of his settlement proposals were made to Google.

### H. UBER SETTLES THE WAYMO ACTION

93.     In February 2018, while controlling Mr. Levandowski's defense, Uber settled the Waymo Action with Waymo/Google.  The existence of a settlement between Uber and Waymo was publicly announced, but limited information regarding the exact terms of the settlement is publicly available.

94.     Upon information and belief, that settlement agreement contained broad releases by both parties releasing claims as to the other's past and present employees.

95.     Upon information and belief, Uber agreed to a broad release as to Mr. Levandowski, a past employee of Google.

96.     In addition, upon information and belief based on publicly available information, in the Waymo Settlement, Uber agreed to never hire or do business with Mr. Levandowski ever again.

97.     Upon information and belief, because of the Waymo settlement terms, Uber refused to close on its acquisition of Otto Trucking or support Mr. Levandowski's trucking business.

98.     Upon information and belief, Uber traded Mr. Levandowski's rights in Otto Trucking and his ability to practice his profession in exchange for a settlement with Waymo.

### I. UBER REQUESTS THAT MR. LEVANDOWSKI TESTIFY SHORTLY BEFORE THE ARBITRATION HEARING

99.     On April 2, 2018, days before the final arbitration hearing and nearly a year and a half after it accepted its obligation to indemnify Mr. Levandowski, Uber for the first time informed Mr. Levandowski that it intended to seek reimbursement for the Expenses it advanced for Mr. Levandowski to defend himself in the arbitration.  **Exhibit E** is a true and correct copy of Uber's April 2, 2018 letter.

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 19 of 44

100.    One basis for Uber's claim for reimbursement was that Mr. Levandowski "refused to testify at his deposition through an unjustifiably broad invocation of the Fifth Amendment"—which Mr. Levandowski had exercised over a year before with full knowledge of Uber.

101.    Nevertheless, in its April 2, 2018 letter, Uber claimed that Mr. Levandowski's refusal to testify in the arbitration proceedings (after the *Waymo* court had issued an order of referral to the United States' attorney) was now a breach of the Indemnification Agreement.

102.    Uber then demanded that Mr. Levandowski waive his Fifth Amendment rights and testifying during the arbitration.

103.    In response to Uber's request, Mr. Levandowski immediately alerted Google and the arbitration panel that he was willing to testify and offered to make himself available for deposition before the arbitration hearing.

104.    Mr. Levandowski also provided the arbitration panel and Uber with a proffer of the topics on which he was willing to testify.

105.    Mr. Levandowski's offer to testify was denied by the arbitration panel, and Uber continued to pay Mr. Levandowski's legal fees and retain control over Mr. Levandowski's defense through the arbitration hearing and post-hearing briefing.

106.    In addition, for the first time, Uber also stated that it believed that Google's claims relating to an entity called "Tyto" are Excluded Claims for which Uber may seek reimbursement after the arbitration was concluded because, according to Uber, Mr. Levandowski "provided no information to Stroz Friedberg regarding his connection to [Tyto]."

107.    Uber's claims were false.  Uber accepted Mr. Levandowski's tender of indemnity *only after* Google's commencement of the arbitration proceeding alleging claims relating to Tyto and *only after* Mr. Levandowski had been interviewed by Uber extensively about Google's allegations relating to Tyto. In addition, Mr. Levandowski's devices given to Stroz had extensive information about Tyto on them.  And Stroz had specifically identified other materials on Mr. Levandowski's devices that he had not disclosed during interviews.

108.    In fact, Uber had considered acquiring Tyto in 2015 but declined to do so at that time.  Tyto was ultimately acquired by Otto with Uber's consent and at Uber's request prior to

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 20 of 44

Uber closing on its acquisition of Otto to secure a lower price for Tyto than what Tyto would have requested had it known that Uber was the acquirer.

109. Moreover, prior to April 2018, Uber received extensive documents and information about Tyto in the Waymo Action and had actively participated in preparing former Tyto employees (then Uber employees) for depositions, through which Uber acquired knowledge that Mr. Levandowski had helped Tyto get started. Indeed, Tyto's founder, Brent Schwarz, its technological lead, James Haslim, and the manager of the entity that invested in Tyto, Ognen Stojanovski, all worked for Uber and were deposed about Tyto. Uber had counsel present at the meetings with these witnesses and during most, if not all, of their testimony. These individuals were also central witnesses in the two arbitrations with Google with respect to the Tyto-related allegations.

110. Specifically, Uber was aware that Mr. Levandowski had facilitated the relationship between Tyto's founder and its investor, a holding company managed by Mr. Stojanovski that invested funds provided by two irrevocable trusts formed for the benefit of Mr. Levandowski's children, and would visit Tyto and his friends at that company to talk about technical and business matters from time to time. Uber was also aware of Pierre Droz's (a Google employee) allegations that Mr. Levandowski was involved with Tyto and even deposed him extensively on that very topic during the Waymo litigation.

111. Armed with this knowledge, Uber paid for and controlled Mr. Levandowski's defense of the arbitration. In fact, Uber did not raise any issues regarding coverage until April 2018.

**J. UBER REFUSES TO PAY EXPENSES RELATING TO GOOGLE'S CLAIMS**

112. On March 28, 2019, the arbitration panel issued an interim award in favor of Google. The arbitration panel found violation of the exact claims covered by the Indemnification Agreement and found that Mr. Levandowski needed to pay back every cent of the compensation paid by Google.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

FIRST AMENDED COMPLAINT

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 21 of 44

113.    On May 13, 2019, Mr. Levandowski requested confirmation from Uber that it was going to abide by its indemnity obligations and pay for any adverse award in light of the interim award. **Exhibit F** is a redacted copy of Mr. Levandowski's May 13, 2019 letter.

114.    In addition, Mr. Levandowski responded to Uber's claim that Mr. Levandowski did not disclose information relating to Tyto to Stroz during the due diligence. Mr. Levandowski identified numerous documents that the arbitration panel relied on relating to Tyto that were on the devices he provided to Stroz as well and pointed out that documents from his devices were shown to witnesses at the arbitration hearing.

115.    Mr. Levandowski sent Uber a follow up letter on June 27, 2019. **Exhibit G** is a true and correct copy of that follow-up letter.

116.    On July 3, 2019, Uber responded to Mr. Levandowski's May and June 2019 letters stating that Mr. Levandowski had breached the Indemnification Agreement, that a majority of the interim award was "attributable to an Excluded Claim," and that "Uber has no contractual obligation to advance any funder to Mr. Levandowski or to Google on Mr. Levandowski's behalf." **Exhibit H** is a true and correct copy of Uber's July 3, 2019 letter.

117.    On August 15, 2019, Mr. Levandowski was indicted for thirty-three counts of trade secret misappropriation. The alleged trade secrets at issue in the indictment were some of the same ones that were at issue in the Waymo Action. Mr. Levandowski ultimately agreed to plead guilty to one count of trade secret misappropriation based on his access of one Google document containing trade secret information on one occasion after he left Google and has accepted restitutionary obligations in the amount of $756,499.22. This one file was the same file that Stroz expressly identified in its report to Uber, and in fact, the Stroz report was the basis for the indictment and the plea. The government agreed to dismiss the remaining thirty-two counts against Mr. Levandowski.

118.    On August 30, 2019, counsel for Uber claimed that Mr. Levandowski had fraudulently induced Uber into entering the Indemnification Agreement, the remedy for which was rescission of the agreement. **Exhibit I** is a true and correct copy of Uber's August 30, 2019 letter.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 22 of 44

119.     At this point in time, Uber did not clearly state that the Indemnification Agreement was rescinded (and instead said it had a remedy of rescission should it choose to exercise it), make any offer to restore the consideration it received under the agreement, or cede control of Mr. Levandowski's defense.

120.     Uber continued to advance payment for expenses incurred through September 25, 2019.

121.     On September 27, 2019, Uber exercised its control over Mr. Levandowski to terminate its engagement of Goodwin Procter as counsel for Mr. Levandowski.  Following this termination, Mr. Levandowski separately engaged Goodwin Procter to represent him.

122.     In addition, on November 5, 2019, Uber filed a Form 10-Q with the Securities and Exchange Commission.  In that filing, Uber again affirmed its indemnity obligations, stating, "The panel's final award is expected by December 24, 2019. Pursuant to a contractual obligation, Uber is indemnifying both employees with respect to certain claims.  Whether Uber is ultimately responsible for such indemnification, however, depends on the exceptions and conditions set forth in the indemnification agreement." **Exhibit J** contains excerpts from Uber's November 2019 10-Q filing with the Securities Exchange Commission.

123.     On December 6, 2019, the arbitration panel issued a final arbitration award.  In addition to the findings from the Interim Award, the Final Award awarded Google prejudgment interest at the 10% rate pursuant to Cal. Civ. Code § 3287, and awarded attorneys' fees and costs to Google under Cal. Civ. Code. § 1717.

124.     The Final Award was not based on any alleged trade secret misappropriation by Mr. Levandowski or others.  During the arbitration proceedings, Google had repeatedly represented that it was pursuing only claims premised on different conduct than what was at issue in the Waymo litigation.  The arbitration panel recognized this on several occasions.

125.     On December 10, 2019, Mr. Levandowski informed Uber of the final award. **Exhibit K** is a true and correct copy of Mr. Levandowski's December 10, 2019 letter.  Because of the lack of clarity in Uber's previous statements, Mr. Levandowski asked Uber, as the Indemnitor in control of the defense of the case, how it would like to proceed.  Specifically,

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

FIRST AMENDED COMPLAINT

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 23 of 44

Mr. Levandowski inquired whether Uber intended to resolve the matter by paying the judgment or whether it would continue to advance Expenses, including paying for Mr. Levandowski's counsel through any appeal and posting a bond to stay the judgment pending appeal.

126. On December 31, 2019, Uber responded to Mr. Levandowski's December 10, 2019 letter and stated that it rescinded the Indemnification Agreement. **Exhibit L** is a true and correct copy of Uber's December 31, 2019 letter. The stated basis for rescission of the Indemnification Agreement was Mr. Levandowski's alleged failure to disclose his connection to Tyto—the same basis that Uber previously stated for seeking reimbursement under the Indemnification Agreement for Expenses paid relating to the claims based on Tyto.

127. Uber stated that it would not pay any portion of the final award or advance any additional Expenses.

128. In addition, Uber ceded its right to direct and control the defense of Mr. Levandowski's case, stating, "Nor will Uber . . . take any steps—including hiring separate counsel—to direct and control Mr. Levandowski's petition to vacate the Final Award or any subsequent appeals."

129. On February 5, 2020, Uber provided payment for Mr. Levandowski's Expenses through September 25, 2019. Uber did not provide payment for any Expenses incurred after that date.

130. On March 4, 2020, Judge Schulman in San Francisco Superior Court entered a judgment in Google's favor against Mr. Levandowski in the amount of $179,047,998.64. **Exhibit M** is a true and correct copy of the judgment in Google's favor.

131. On March 4, 2020, following entry of the judgment in Google's favor, Mr. Levandowski filed a chapter 11 petition in the United States Bankruptcy Court for the Northern District of California commencing the Chapter 11 Case.

132. On March 6, 2020, Mr. Levandowski provided notice of the judgment to Uber and requested advancement of payment for these Expenses under Section 2.3 of the Indemnification Agreement. In addition, Mr. Levandowski requested an advance for attorneys' fees and costs in the amount of $475,571.32, which Mr. Levandowski had incurred between September 26, 2019

24

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

and February 29, 2020.  **Exhibit N** is a copy of Mr. Levandowski's March 6, 2020 request without exhibits.

133.    On March 27, 2020, Uber responded to Mr. Levandowski's March 6, 2020 letter and reaffirmed its position that it had rescinded the Indemnification Agreement and was not going to pay Google's judgment or any other Expenses.  **Exhibit O** is a copy of Uber's March 27, 2020 letter.

134.    As a result, Mr. Levandowski filed an arbitration demand with JAMS San Francisco.

135.    Uber filed an answer on April 13, 2020 in which it alleged, among other defenses that it had rescinded the Indemnification Agreement based on Mr. Levandowski's purported fraud, and that if the Indemnification Agreement remains enforceable, a majority of Google's judgment is allocable to Excluded Claims as defined in the Indemnification Agreement.

136.    On July 6, 2020, Uber filed the Proof of Claim, through which it brought into the Chapter 11 Case issues from the arbitration to support its purported position as a creditor of Mr. Levandowski.  **Exhibit P** is a true and correct copy of Uber's Proof of Claim, ECF No. 8-1.

137.    On July 28, 2020, the parties agreed, and the Court approved, that Mr. Levandowski could withdraw his arbitration demand and that all disputes in the arbitration demand, the original complaint in this proceeding, and Uber's proof of claim would be resolved as part of this Adversary Proceeding.

## COUNT I

### (Declaratory Judgment - Waymo Settlement Release)

138.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

139.    On February 8, 2018, Waymo and Uber executed a settlement agreement to resolve Waymo's dispute with Uber.

140.    Upon information and belief, the Waymo Settlement contained broad releases in which Google and Uber released known and unknown claims that have or could be asserted against the other's past and former employees.

141.    Upon information and belief, Mr. Levandowski is a beneficiary of the releases in the Waymo Settlement as he is a former employee of Google.

142.    Upon information and belief, Google excluded from its release the arbitration claims against Mr. Levandowski and Uber did not exclude any claims against Mr. Levandowski in its release.

143.    Upon information and belief, all of the claims in the Proof of Claim and Uber's Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto,  and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, were released by Uber in the Waymo Settlement.

144.    As a result of the Proof of Claim and Mr. Levandowski's objection thereto, a live controversy exists as to whether Uber released Mr. Levandowski in the Waymo Settlement and, if so, what claims Uber released.

145.    This issue is ripe for determination and requires a declaration as to Mr. Levandowski's rights in the Waymo Settlement.

146.    Mr. Levandowski seeks a declaration that the claims and defenses in the Proof of Claim and Uber's Amended Answer and Counterclaims, including Uber's claims for rescission, restitution of benefits provided under the Indemnification Agreement, consequential damages arising from Mr. Levandowski's alleged fraud, contribution from Mr. Levandowski for the Ron and Waymo Settlements, Uber's assertion that the Tyto claims are "Excluded Claims" or that Uber is entitled to a setoff based on Tyto,  and any claim for attorneys' fees arising from litigation relating to the foregoing dispute, are barred by the Waymo Settlement.

## <u>COUNT II</u>

### (Specific Performance to Pay Expenses)

147.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

148. On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation. Ex. A at 1-2.

149. Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer. Ex. A at § 2.1(a).

150. As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims. *Id*. at 3.

151. Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within a set period following a request for advancement.

152. On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

153. Uber has refused to advance payment for the Expenses requested in the March 6 Request and continues to refuse to pay for any Expenses.

154. Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

155. In the Indemnification Agreement, Uber agreed that Mr. Levandowski would be irreparably harmed by Uber's failure to indemnify him against a claim by Google and that monetary damages would be an inadequate remedy. *See id*. at § 3.11. Uber also agreed that Mr. Levandowski may seek specific performance to enforce Uber's obligations under the Indemnification Agreement. *See id.*

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 27 of 44

156.     Moreover, Mr. Levandowski has been irreparably harmed by Uber's continued breach of the Indemnification Agreement.  By way of example only, Uber's breach of the Indemnification Agreement directly caused Mr. Levandowski to have to file this bankruptcy proceeding.  The parties to the Indemnification Agreement specifically agreed that disputes regarding reimbursement of payments made under the Indemnification Agreement would not take be resolved until after Uber has satisfied its obligations to pay any final judgment and the Expenses Mr. Levandowski incurred.  Uber's breach has materially impacted Mr. Levandowski's ability to continue to pursue litigation against Google and Uber.

157.     Any such action for specific performance may be filed in a state or federal court located in the City and County of San Francisco. *See id*. § 3.5.

158.     The Indemnification Agreement was reasonable and supported by adequate consideration in the Indemnification Agreement itself as well as in the overall transaction for Uber to acquire Otto.

159.     A mutuality of remedies exists as either party is able to adjudicate the issue of whether an Indemnified Claim is an Excluded Claim and have agreed to seek resolution of whether any claim is an Excluded Claim in this proceeding.  .

160.     The contract is sufficiently definite in requiring that Uber must first pay for all Expenses, including payment of any awards and judgments or posting any appeal bond, and may only seek reimbursement of any Expenses following resolution of an Indemnified Claim through either settlement or a final, non-appealable judgment.

161.     Therefore, Mr. Levandowski seeks to enforce by this action the terms Uber agreed to in the Indemnification Agreement—that Uber pay for the Expenses requested on March 6, 2020 as well as payment of Google's judgment and the attorneys' fees and costs incurred by Mr. Levandowski thus far, as well as any post-judgement interest which has or will accrue, and all other Expenses that Mr. Levandowski has and will incur.

//

//

//

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

**(Breach of Indemnification Agreement)**

162.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

163.    On April 11, 2016, Mr. Levandowski and Uber entered into the Indemnification Agreement wherein Uber agreed to indemnify Mr. Levandowski for "any claim that has arisen out of or resulted from any Pre-Signing Bad Acts . . . committed by [Mr. Levandowski]" arising out of the facts or circumstances that were part of the Stroz investigation.  Ex. A at 1-2.

164.    Specifically, Uber agreed to "indemnify and hold harmless [Mr. Levandowski] . . . to the maximum extent permitted by applicable law . . . from and against any and all Expenses incurred by [Mr. Levandowski]" any claims brought by a Former Employer "arising out of or alleged to arise out of" among other things, Mr. Levandowski's breach of his "fiduciary duty or duty of loyalty to [his] Former Employer" and/or "breach [] of any non-solicitation, non-competition, confidentiality or similar restrictive covenant or agreement" between him and a Former Employer.  Ex. A at § 2.1(a).

165.    As defined in the Indemnification Agreement, "Expenses" includes reasonable attorneys' fees, costs associated with defense against a Former Employer's claim, and any awards, judgments, or any amounts paid or to be paid in settlement of Google's claims.  *Id*. at 3.

166.    Under Section 2.3 of the Indemnification Agreement, Uber is required to advance payment for Expenses within fifteen Business Days of a request for advancement.

167.    On March 6, 2020, Mr. Levandowski requested that Uber advance payment for Google's judgment and the attorneys' fees and costs Mr. Levandowski had incurred between September 26, 2019 and February 29, 2020 as Expenses under Section 2.3.

168.    Uber has refused to advance payment for the Expenses requested in the March 6 Request.  Mr. Levandowski has paid many of the Expenses since Uber refused to advance payment.

169.    Mr. Levandowski has fully performed his obligations under the Indemnification Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

170. As a result of Uber's refusal to honor its obligations under the Indemnification Agreement, Mr. Levandowski has suffered damages at least in the amount of the Expenses he has paid and will be required to pay to continue funding this litigation against Uber, the cost of the chapter 11 proceedings and this adversary proceeding and having to liquidate assets in the middle of a pandemic to continue to pursue his rights under the Indemnification Agreement and in challenging Google's judgment.

## COUNT IV

### (Declaratory Judgment – Uber's Rescission Claim)

171. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

172. In the Proof of Claim, Uber identifies itself as a creditor based on its purported rescission of the Indemnification Agreement.

173. In addition, Uber has refused to pay Expenses due under the Indemnification Agreement because of the purported rescission.

174. Mr. Levandowski contends that Uber waived any right to rescind because it expressly confirmed and ratified the Otto Trucking Merger Agreement, one key component of the April 11, 2016 transactions, and thereby ratified the transaction Uber claims it was fraudulently induced into entering.

175. Mr. Levandowski also contends that Uber also impliedly waived, is estopped from asserting, and/or ratified any alleged fraudulent inducement on which Uber's purported rescission is based by entering into an amendment of the transaction Uber alleges it was fraudulently induced to enter into.

176. Mr. Levandowski further contends that Uber's rescission claim is barred by its unreasonable delay in rescinding the Indemnification Agreement, failure to return consideration provided, and actions by Uber that are inconsistent with a claim for rescission as described hereinabove.

177. Uber has not returned any consideration it received under the Indemnity Agreement, including Mr. Levandowski's devices, which it continues to retain through Stroz, as

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

FIRST AMENDED COMPLAINT

well as the consideration received under the full transaction for the Otto acquisition. Such failure is fatal to any rescission claim, especially where, as here, Uber's refusal or inability to return the consideration it received is due to its delay in exercising any purported right to rescission.

178.    To the extent that Uber's ability to return the consideration received is impossible, this impossibility is due to Uber's delay in exercising the purported rescission after it controlled Mr. Levandowski's defense and settlement ability for years and benefited from Mr. Levandowski's cooperation with his defense and Uber's defense in the Waymo action.

179.    Uber has also ratified any purported fraud and acted in ways inconsistent with rescission, including by affirming its obligations under the Indemnification Agreement in its public filings.

180.    Uber's performance under the Indemnification Agreement for years and belated rescission of that agreement has substantially prejudiced Mr. Levandowski.

181.    Finally, upon information and belief, Uber has released any claim for rescission as part of its release in the Waymo Settlement.

182.    As a result of the acts described herein, a live controversy exists as to whether Uber has a right to rescind and whether its purported rescission is effective.

183.    This issue is ripe for determination and requires a declaration as to Uber's right to rescind the Indemnification Agreement and whether Uber is a proper creditor in the Chapter 11 Case.

184.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement.

### COUNT V

### (Declaratory Judgment and Damages: Rescission of Otto Transaction)

185.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

186.    As shown herein, Mr. Levandowski denies that Uber has any right to rescind the Indemnity Agreement and Mr. Levandowski seeks a declaratory judgment regarding Uber's rescission claim/defense.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

First Amended Complaint

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 31 of 44

187.    Alternatively, if the Court determines that Uber has rescinded the Indemnification Agreement, the entirety of the Otto transaction must also be rescinded and all consideration Uber received from the Otto transaction must be returned to Mr. Levandowski.

188.    In agreeing to sell Otto to Uber and lead Uber's self-driving car program, Mr. Levandowski conveyed repeatedly to Uber's representatives that he was concerned that Google would sue him.  Because of these concerns, Uber agreed to provided indemnity as key and indivisible part of the Otto transaction and as an inducement to Mr. Levandowski to sell Otto to Uber. Mr. Levandowski would not have entered into the Otto transaction without the Indemnity Agreement because of his well-founded fear of litigation against him by Google.

189.    For this reason, on April 11, 2016, Uber and Mr. Levandowski executed documents for the acquisition of Otto, including the Indemnification Agreement.   All of the agreements executed on April 11, 2016 are part of one single transaction that can not be divided.

190.    Uber's rescission of the Indemnification Agreement necessarily requires rescission of the entire Otto transaction, including returning all consideration related to the transaction, including the intellectual property Uber received from its acquisition of Otto.

191.    Should the Court determine that Uber effectively rescinded the Indemnification Agreement, a live controversy exists as to whether Uber's rescission also rescinds the Otto transaction and requires return of all consideration Uber received from that transaction.

192.    Mr. Levandowski therefore seeks a declaration that Uber has no right to rescind the Indemnification Agreement without also rescinding the Otto transaction and returning all consideration received from that deal.

193.    In addition, Mr. Levandowski seeks damages, including any consequential damages, arising out of Uber's rescission of the Otto transaction.

## COUNT VI

### (Declaration As to Unenforceability of Amendment and Termination of Otto Trucking Agreement as to Anthony Levandowski)

194.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

195. Mr. Levandowski is a party to the Otto Trucking Agreement, including as to Section 5.4 and 5.11.

196. Section 5.4 allowed Mr. Levandowski to form a new trucking company and to obtain the IP License from Uber if Uber failed to satisfy its funding obligations to Otto Trucking in the three years after closing on that transaction.

197. Section 5.11 allowed Mr. Levandowski to form a new trucking company and demand that Uber provide him with the IP License for use in the new trucking company if Uber terminated the Otto Trucking Agreement after acquiring Otto.

198. Uber closed on its acquisition of Otto on August 18, 2016.

199. In November 2017, Uber provided notice that it was exercising its option to acquire Otto Trucking.

200. After providing notice, Uber stalled the closing of the Otto Trucking acquisition.

201. Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was controling Mr. Levandowski's defense, including regarding settlement.

202. Upon information and belief, Uber agreed in the Waymo settlement to terms that gave away Mr. Levandowski's rights.

203. Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

204. Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

205. Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

206. Uber acquired Otto Trucking on August 5, 2018.

207. On August 31, 2020, in response to Mr. Levandowski's complaint, Uber answered and alleged that it had terminated the Otto Trucking Agreement and had acquired Otto Trucking pursuant to a new Otto Trucking agreement dated August 5, 2018.

208. This was the first time that Mr. Levandowski learned that Uber had terminated the Otto Trucking Agreement.

209. On September 11, 2020, Uber produced a copy of an Amendment and Termination of the Otto Trucking Agreement dated August 5, 2018 (the "Termination Agreement") and an Agreement and Plan of Merger for Otto Trucking LLC dated August 5, 2018 (the "New Otto Trucking Agreement").

210. Upon receipt, of the Termination Agreement, Mr. Levandowski learned for the first time that Uber and Otto Trucking had agreed to terminate the Otto Trucking Agreement.

211. Mr. Levandowski also learned that while the agreement affirmed his status as a party as to Section 5.11, it purported to terminate his rights under that provision without his knowledge or consent.

212. Indeed, Mr. Levandowski did not sign the Termination Agreement and has never agreed to relinquish his right to the IP License.

213. A controversy exists as to whether Uber and Otto Trucking's purported termination of Section 5.11 is enforceable and effective as to Mr. Levandowski.

214. Mr. Levandowski thus seeks a declaration that Uber and Otto Trucking could not and did not terminate his rights under Section 5.11 when it executed the Termination Agreement without his consent or signature on that document.

## COUNT VII

**(Specific Performance of Uber's Obligations to Provide Mr. Levandowski an IP License and Form an New Trucking Company Under Section 5.11 of Otto Trucking Agreement)**

215. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

216.    In addition to requiring the Indemnification Agreement, Mr. Levandowski also conditioned his sale of Otto to Uber on Uber's support for his autonomous trucking business. Uber agreed to this condition in the Otto Trucking Agreement.

217.    Under the Otto Trucking Agreement, Uber received an option to acquire Otto Trucking.

218.    Uber closed on its acquisition of Otto on August 18, 2016.  The effect of the acquisition of Otto obligated Uber to support Mr. Levandowski's trucking business as the only scenario where Uber could walk away from Otto Trucking was if Uber did not acquire Otto.  For example, even if Uber terminated the Otto Trucking Agreement after acquired Otto, Uber was required to give Mr. Levandowski an exclusive license to use Uber's self-driving technology in the field of trucking to form a new trucking company outside of Uber.  The terms of the exclusive license are described at Exhibits E and F of the Otto Trucking Agreement.

219.    In late November 2017, Uber exercised its right to acquire Otto Trucking by providing notice of its decision.

220.    On August 5, 2018, Uber terminated the Otto Trucking Agreement.

221.    Uber hid its termination of the Otto Trucking Agreement from Mr. Levandowski for over two years, finally disclosing its purported termination of the Otto Trucking Agreement only recently in its answer to the Complaint.

222.    Under Section 5.11, because Uber acquired Otto and obtained the benefits of that acquisition, Uber is required to provide a license to these patents and any other patents or intellectual property related to autonomous trucking to Mr. Levandowski for use in the field of trucking.

223.    Mr. Levandowski seeks specific performance of Uber's obligation under Section 5.11.  Specifically, Mr. Levandowski seeks an order requiring Uber to provide a company formed by Mr. Levandowski the IP License in a form consistent with Exhibit E and F of the Otto Trucking Agreement.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

224. A search for autonomous driving related patents yielded over hundreds of results for patents owned by Uber. **Exhibit Q** is a copy of the patent search result for Uber's self-driving related patents.

225. Mr. Levandowski has performed all obligations under the Otto Trucking Agreement.

226. Although Mr. Levandowski contends that the ten business day period referenced in Section 5.11 relates to how "promptly" his right to the IP License becomes available after termination of the Otto Trucking Agreement and that there is no deadline to provide such notices, on September 21, 2020, within ten business days of receipt of the Termination Agreement, Mr. Levandowski provided Uber with written notice that he is exercising his right to form the new trucking company, and has requested that Uber provide the IP License and work together to sign and prepare organization documents for the new company. **Exhibit R** is a copy of the letter notifying Uber of Mr. Levandowski's election of the right to obtain the IP License.

227. Uber has refused to provide the requested license.

228. Mr. Levandowski will be irreparably harmed by Uber's refusal to provide the IP License and to form the trucking company as agreed.

229. Uber received adequate consideration, at least in the form of its acquisition of Otto, in exchange for agreeing to Mr. Levandowski's right to lead an autonomous trucking business within Uber or with Uber's IP License.

230. A mutuality of remedies exists as the agreement provides for a method for adjudicating disputes, including allowing either party to sue for specific performance.

231. The contract is sufficiently definite in requiring that Uber must provide the IP License to Mr. Levandowski on terms consistent with Exhibits E and F of the Otto Trucking Agreement if the Otto Trucking Agreement was terminated after Uber acquired Otto.

232. Therefore, Mr. Levandowski seeks an order from the Court requiring Uber to provide the IP License as required by Section 5.11 of the Otto Trucking Agreement and to work with Mr. Levandowski to form the new trucking company.

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 36 of 44

233. In the alternative, Mr. Levandowski seeks damages for Uber's breach of Section 5.11 of the Otto Trucking Agreement, including damages for the value of the IP License and either the value of Uber Freight, which is estimated as $4 billion once Uber closes on its latest round of financing, and/or the trucking company he should have been able to form and operate using the IP License and lost profits from that company.

## COUNT VIII

### (Declaration Regarding Uber's Fiduciary Duty To Shut Down Uber Freight)

234. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

235. In addition to requiring Uber to provide the IP License upon termination, Section 5.11 of the Otto Trucking Agreement also requires Uber to become a member of a new limited liability trucking company formed by Mr. Levandowski.

236. Uber's membership interest was to be 50% of the then available shares.

237. The material terms of Uber's membership are provided in Exhibit F to the Otto Trucking Agreement, referenced in Section 5.11.

238. Exhibit F addressed fiduciary duties of managers during the initial development of the company, requiring that they owe the duties to the company and the holders of equity in that company the same fiduciary duties that would be owed in a corporation until the company raises at least $17,500,000 in investments.

239. Exhibit F, however, does not contain any limitation or waiver of the statutory fiduciary duties owed by members of the company to the company and other members.

240. As such, once formed, Uber owes the new trucking company and Mr. Levandowski statutory fiduciary duties, including the duty not to compete with the company, including by continuing to operate Uber Freight.

241. In its answer, Uber denies that Exhibit F contemplates that Uber would owe Mr. Levandowski and the new trucking company fiduciary duties that would prevent it from competing with the company.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

37

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 37 of 44

242. As such, a controversy exists as to what fiduciary duties Uber will owe in the new trucking company to be formed consistent with the terms of Section 5.11 and Exhibit F of the Otto Trucking Agreement and whether Uber may continue to operate Uber Freight once that company is formed.

243. Mr. Levandowski requests a declaration as to Uber's obligations and fiduciary duties to Mr. Levandowski and the new trucking company as provided in Section 5.11 and Exhibit F of the Otto Trucking Agreement, including, Uber's obligation to shut down Uber Freight.

## COUNT IX

### (Breach of Covenant of Good Faith and Fair Dealing )

244. Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

245. In addition to receiving indemnity, Mr. Levandowski conditioned his sale of Otto on Uber supporting his autonomous trucking business. Uber agreed to that condition and on April 11, 2016, at the same time it executed the Otto Agreement, Uber executed the Otto Trucking Agreement.

246. The Otto Trucking Agreement includes an implied covenant of good faith and fair dealing. The implied covenant ensures that neither party may engage in arbitrary or unreasonable conduct and thereby prevent the other party from receiving the fruits of the bargain.

247. The intent of the parties for Mr. Levandowski to be able to continue to pursue the trucking business he left Google to start with Uber's support in exchange for Mr. Levandowski selling Otto to Uber.

248. This intent is reflected in the Otto Trucking Agreement as the only scenario where Uber could walk away from Otto Trucking and not support Mr. Levandowski's trucking business was if Uber did not acquire Otto.

249. After acquiring Otto, Uber had two options for supporting the trucking business. It could acquire Otto Trucking and appoint Mr. Levandowski as the non-executive chairman of that business.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 38 of 44

250.     In the alternative, Uber could terminate the acquisition of Otto Trucking, but support an outside trucking venture started by Mr. Levandowski as an investor.  Uber was obligated to provide an exclusive license to its self-driving technology for Mr. Levandowski to use in the field of trucking in exchange for membership in Mr. Levandowski's new company. The IP License was an exclusive license for trucking, which barred Uber from competing with Mr. Levandowski's trucking business.  Uber's membership interest in Mr. Levandowski's new company also prevented Uber from competing with that business based on the statutory duties owed by members of an LLC.

251.     Uber did neither.

252.     Upon information and belief, Uber stalled the closing of the Otto Trucking acquisition so that it could work out a settlement with Waymo/Google in the trade secrets action. During that time, Uber was in control of Mr. Levandowski's defense and settlement prospects, and had barred Mr. Levandowski from participating in the settlement discussion or discussing settlement directly with Google.

253.     Upon information and belief, because of its agreement in the Waymo Settlement to never hire or do business with Mr. Levandowski again, Uber continued to delay the Otto Trucking closing and told Mr. Levandowski that it would not close the transaction if he was still part of the company and would not in any event give him the IP license.

254.     Uber threatened to leave the transaction in limbo and force Mr. Levandowski to engage in protracted litigation to enforce his rights under the Otto Trucking Merger Agreement.

255.     Faced with the prospect of litigating immediately with a multi-billion dollar company in the midst of other active litigation—the defense of which was under Uber's control—and a criminal investigation, Uber's actions coerced Mr. Levandowski to resign from Otto Trucking and to sell his interest in the company at a significant discount.

256.     But Mr. Levandowski, as a Company Founder and in his individual capacity, remained a party to the Otto Trucking Agreement with respect to Section 5.4 and 5.11 of that agreement and a beneficiary of the remainder of the Otto Trucking Agreement independent of his prior status as a unitholder of the company.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

39

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 39 of 44

257. Uber and Otto Trucking agreed between them, without Mr. Levandowski's agreement or consent, to terminate the Otto Trucking Agreement.

258. Uber and Otto Trucking hid the termination from him for two years.

259. Despite terminating the Otto Trucking Agreement after acquiring Otto, Uber refused to provide Mr. Levandowski with the IP License, and in fact, Uber and Otto Trucking agreed, without Mr. Levandowski's agreement or consent and without providing any consideration, to terminate Mr. Levandowski's individual rights under the Otto Trucking Agreement.[1]

260. Uber and Otto Trucking then entered into a separate agreement whereby Uber proceeded to acquire Otto Trucking and started Uber Freight without Mr. Levandowski, the trucking business Uber had promised that Mr. Levandowski would lead.

261. In fact, the parties agreed in the New Trucking Agreement to terms intended to keep Mr. Levandowski out of the company.

262. As a party to section 5.4 and 5.11 and as a beneficiary to the remainder of the Otto Trucking Agreement, Mr. Levandowski has a right to enforce that agreement, including the covenant of good faith and fair dealing.

263. To the extent that Mr. Levandowski has any obligations under that agreement, he has satisfied them.

264. Uber's actions described herein were unreasonable, made in bad faith, and have deprived Mr. Levandowski of the fruits of the bargain, including the agreed-to benefit of running a trucking business with Uber's support.

265. By preventing Mr. Levandowski from obtaining the benefits of the Otto Trucking Agreement, Uber has violated the implied covenant of good faith and fair dealing.

266. After Mr. Levandowski's forced divestment, Uber's refusal to provide the IP License and for the new trucking company, and Uber's acquisition of Otto Trucking to form Uber Freight, Uber continued to operate that business. Uber Freight has reported hundreds of

---

[1] Mr.Levandowski contends, as alleged in Count VII that such agreement to terminate Mr. Levandowski's rights was ineffective and unenforceable.

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY

Case: 20-03050   Doc# 49   Filed: 09/28/20   Entered: 09/28/20 17:06:06   Page 40 of 44

millions in revenue since its creation and Mr. Ron, who heads Uber Freight, stated that he and Uber "think there is a very clear path to profitability."

267.    As a result of Uber's breaches, Mr. Levandowski has suffered damages in an amount to be proven at trial, which amount should be at least $4.128 billion.

### COUNT X

### (Objection to Claim)

268.    Mr. Levandowski incorporates by reference the preceding paragraphs as if fully stated herein.

269.    For the reasons set forth above, the Indemnity Agreement is not subject to rescission and, if it had been, Uber waived its right to assert such remedy.

270.    For the reasons set forth above, Uber is liable under the Indemnity Agreement to advance his Expenses (as defined in the Indemnification Agreement).

271.    For the reasons set forth above, Mr. Levandowski generally denies the evidentiary bases upon which the Proof of Claim is based and specifically denies that (a) Uber was fraudulently induced to enter into the Indemnity Agreement, (b) Mr. Levandowski failed to comply with his obligations under the Indemnity Agreement, and (c) Uber's obligations under the Indemnity Agreement are subject to allocation as asserted in the Proof of Claim, which in any event, cannot be adjudicated until after Uber satisfies its obligations under the Indemnification Agreement.

272.    For the reasons set forth above, any claim for offset or contribution is also undermined by its active participation in the conduct at issue in the Waymo Action and the Google arbitration as it (a) encouraged, if not directed, Mr. Levandowski to recruit Google employees to join Otto and Uber, and (b) knew about Mr. Levandowski's retention of Google information and access of the one file at issue in the plea agreement after he left Google.

273.    For the reasons set forth above, Mr. Levandowski denies that Uber has any right to contribution from Mr. Levandowski for the Waymo settlement.  Waymo did not prove that Mr. Levandowski misappropriated any trade secrets in that case.  As for the one file that Mr. Levandowski accessed after he left Google, Uber was well aware of that conduct and proceeded

Goodwin Procter LLP
Attorneys at Law
Silicon Valley

to acquire Mr. Levandowski's company and work with him anyway.  Moreover, Mr.

Levandowski's guilty plea that resulted in a total restitution amount of approximately $750,000

further demonstrates the unreasonableness of Uber's decision to settle with Waymo for

$245,000,000 in stock, among other consideration.  In addition, to the extent that any trade

secrets were taken and used at Uber, those trade secrets did not come from Mr. Levandowski, but

rather a different former Google employee.  Indeed, as admitted in Uber's public statements,

Uber's self-driving software—an area that Mr. Levandowski did not work on at Google or

Uber—contained problematic functions that will require it to enter into a license agreement with

Waymo for use of Waymo's intellectual property.  Upon information and belief, the Waymo

Settlement, entered into after discovery of possible misconduct relating to Uber's source code,

settled issues relating to theft of trade secrets by individuals who are not Mr. Levandowski.

274.    Mr. Levandowski therefore seeks disallowance in full of the Proof of Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Mr. Levandowski prays for the following relief:

1.    A declaration that Uber has released all claims and defenses against Mr.
Levandowski alleged in the Proof of Claim and Amended Answer and
Counterclaims;

2.    An order enforcing the Indemnification Agreement and requiring Uber pay all
Expenses Mr. Levandowski has incurred and will incur, including Google's
judgment and any interest that has accrued;

3.    Damages for Uber's breach of the Indemnification Agreement;

4.    A declaration that Uber's purported rescission of the Indemnification Agreement is
ineffective and invalid;

5.    In the alternative to paragraph 4, a declaration that if Uber's rescission of the
Indemnification Agreement is effective, the entire Otto transaction is rescinded
and all consideration received from that transaction must be returned;

6.    A declaration that Uber's attempt to eliminate Mr. Levandowski's rights under
Section 5.11 of the Otto Trucking Agreement is unenforceable;

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 42 of
44

1    7.    An order requiring Uber to specifically perform its obligations under Section 5.11

2          of the Otto Trucking Agreement to provide Mr. Levandowski the IP License and

3          to form the new trucking company or, in the alternative, damages for the value of

4          that license and the valuation of Uber Freight and/or the trucking business that

5          would have been formed but for Uber's breaches and lost profits from that

6          business;

7    8.    A declaration that Uber Freight must be shut down;

8    9.    Damages in an amount to be proven at trial for Uber's breach of the express and

9          implied terms of the Otto Trucking Agreement;

10   10.   An order disallowing in full the proof of claim;

11   11.   Prejudgment and post-judgment interest;

12   12.   Attorneys' fees and costs incurred by Mr. Levandowski pursuant to Section 3.2 of

13         the Indemnification Agreement and Section 8(n) of the Otto Trucking Agreement,

14         including fees incurred in the Bankruptcy proceeding due to Uber's failure to

15         advance expenses; and

16   //

17

18

19

20

21

22

23

24

25

26

27

28

Case: 20-03050    Doc# 49    Filed: 09/28/20    Entered: 09/28/20 17:06:06    Page 43 of 44

13.     All other relief that is equitable and just.

Dated: September 28, 2020                    Respectfully submitted,


                                             By:/s/ *Brett M. Schuman*
                                                 Brett M. Schuman (SBN 189247)
                                                 *bschuman@goodwinlaw.com*
                                                 Rachel M. Walsh (SBN 250568)
                                                 *rwalsh@goodwinlaw.com*
                                                 **GOODWIN PROCTER LLP**
                                                 Three Embarcadero Center
                                                 San Francisco, California 94111
                                                 Tel.: +1 415 733 6000
                                                 Fax.: +1 415 677 9041

                                                 Hong-An Vu
                                                 *HVu@goodwinlaw.com*
                                                 **GOODWIN PROCTER LLP**
                                                 601 S. Figueroa Street, 41st Flr.
                                                 Los Angeles, California  90017
                                                 Tel.: +1 213 426 2500
                                                 Fax: +1 213 623 1673

                                             Attorneys for Plaintiff and Debtor and Debtor
                                             In Possession Anthony Levandowski

GOODWIN PROCTER LLP
ATTORNEYS AT LAW
SILICON VALLEY