1  Debra I. Grassgreen (CA Bar No. 169978)
   Miriam Manning (CA Bar No. 178584)
2  PACHULSKI STANG ZIEHL & JONES LLP
   One Market Plaza, Spear Tower
3  40th Floor, Suite 4000
   San Francisco, CA 94111
4  Telephone:    (415) 263-7000
   Facsimile:    (415) 263-7010
5  E-mail:dgrassgreen@pszjlaw.com
          mmanning@pszjlaw.com
6
7  David J. Bradford (admitted *pro hac vice*)
   Terri L. Mascherin (admitted *pro hac vice*)
8  Catherine Steege (admitted *pro hac vice*)
   Katharine R. McLaughlin (admitted *pro hac vice*)
9  JENNER & BLOCK LLP
   353 N. Clark St.
10 Chicago, IL 60654
   Telephone:    (312) 222-9350
11 E-mail:dbradford@jenner.com
          tmascherin@jenner.com
12        csteege@jenner.com
          kmclaughlin@jenner.com
13
14 *Counsel for Uber Technologies, Inc.*

15            **UNITED STATES BANKRUPTCY COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
16                  **SAN FRANCISCO DIVISION**

17

18 | In re: | Case No. 20-30242 (HLB) |
19 | ANTHONY SCOTT LEVANDOWSKI, | Chapter 11 |
20 |              Debtor. | |
21 | ANTHONY SCOTT LEVANDOWSKI, an individual, | Adv. Pro. No. 20-03050 (HLB) |
22 | | **UBER TECHNOLOGIES, INC.'S TRIAL** |
23 |              Plaintiff, | **BRIEF** |
24 |              v. | |
25 | UBER TECHNOLOGIES, INC. | |
26 |              Defendant. | |
27
28

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................iii

SUMMARY OF FACTS TO BE PROVEN AT TRIAL........................................................2

    A.    The Operative Contract—The April 16, 2016 Indemnification Agreement............2

    B.    The Allegedly Indemnified Claim—The Arbitration Panel's Award.....................3

        1.    The "Tyto Misconduct." ...................................................................4

        2.    The "Otto Misconduct." ...................................................................5

    C.    Evidence Establishing That Levandowski Is Not Entitled To Indemnification For The Arbitration Award. ...............................................................5

        1.    Levandowski Lied To Stroz, Making Any Claim Based On His Tyto Misconduct An Excluded Claim. ...........................................5

        2.    After The Agreement Was Signed, Levandowski Secretly Caused Google IP To Be Transferred To Uber, Thereby Committing Post-Signing Bad Acts And Voiding The Agreement. .......................................7

            a.    The Waymo Lawsuit Is A "Former Employer Claim." ..................7

            b.    Levandowski's Transfer Of The Planner Code. ...........................8

            c.    Levandowski's Transfer Of Confidential Google Information Related To LiDAR Technology.......................................................9

    D.    Levandowski's Alleged Damages.................................................................9

    E.    Uber's Proof Of Claim...............................................................................11

LEGAL THEORIES ON WHICH UBER RELIES...............................................................12

I.    The Agreement Is Void...........................................................................................13

    A.    Levandowski's Multiple Post-Signing Bad Acts (Affirmative Defense 4 and Counterclaim III). .......................................................................................13

    B.    Levandowski's Unclean Hands (Affirmative Defense 8)....................................14

    C.    Levandowski's "Knowingly Wrongful Conduct" Precludes Indemnification (Affirmative Defense 3).................................................................................16

    D.    Public Policy And The Agreement Bar Indemnification For A Disgorgement Award (Affirmative Defenses 1 and 2, Counterclaim 1)......................................18

i

II.    Most Of The Award Is For An Excluded Claim, For Which Uber Has No Obligation to Provide Indemnity (Affirmative Defenses 5 and 9 and Counterclaim IV)...................19

III.   Any Indemnification That The Court Awards To Levandowski Should Be Less Than $5 Million.........................................................................................................................20

IV.   Levandowski Owes Uber Over $270 Million In Fraud Damages That May Be Setoff Against Any Judgment (Affirmative Defense 10, Counterclaim VI). .............................24

V.    Uber's Proof of Claim Should Be Allowed And Setoff Against Any Judgment (Count X, Affirmative Defense 10, Counterclaims VII, IX, X). ...................................................24

CONCLUSION.................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*All. Mortg. Co. v. Rothwell*,
  10 Cal. 4th 1226 (1995) .................................................................................24

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal App. 4th 1451 (2014) .......................................................................23

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992) ..............................................................................18, 19

*Bell v. Feibush*,
  212 Cal. App. 4th 1041 (2013) .......................................................................18

*In re Branford Partners, LLC*,
  No. SV 06-12551-KT, 2008 WL 8448329 (B.A.P. 9th Cir. Oct. 24, 2008) ............12

*Cleghorn Bar Enters. v. Garlock*,
  No. A114398, 2008 WL 77584 (Cal. Ct. App. Jan. 8, 2008) .............................3

*CTC Real Estate Servs. v. Lepe*,
  140 Cal. App. 4th 856 (2006) .........................................................................23

*Cty. of San Bernardino v. Walsh*,
  158 Cal. App. 4th 533 (2007) .........................................................................23

*People ex rel. Dep't of Transp. v. Superior Court*,
  26 Cal. 3d 744 (1980) ....................................................................................24

*DeRosa v. Transamerica Title Ins. Co.*,
  213 Cal. App. 3d 1390 (1989) .........................................................................15

*Federal Trade Commission v. Lucaslaw Ctr., Inc.*,
  No. SACV 09-0770 DOC (ANX), 2010 WL 11506885 (C.D. Cal. June 3, 2010) ............19

*Federal Trade Commission v. Neovi, Inc.*,
  No. 06-CV-1952 JLS (JMA), 2009 WL 10672945 (S.D. Cal. May 18, 2009) ............15

*Fladeboe v. Am. Isuzu Motors Inc.*,
  150 Cal. App. 4th 42 (2007) ...........................................................................15

*In re Gnadt*,
  No. 11-10378-BFK, 2015 WL 2194475 (Bankr. E.D. Va. May 7, 2015) ...............21

*Hamilton v. Elite of L.A., Inc.* (*In re Hamilton*),
  584 B.R. 310 (B.A.P. 9th Cir. 2018) ................................................................24

iii

*Houge v. Ford*,
  44 Cal. 2d 706 (1955) ...................................................................................20

*Labor Comm'r v. Ramirez (In re Ramirez)*,
  556 B.R. 446 (Bankr. N.D. Cal. 2016) ..........................................................24

*Lemat Corp. v. Am. Basketball Ass'n*,
  51 Cal. App. 3d 267 (1975) ............................................................................17

*Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*,
  272 F.3d 908 (7th Cir. 2001) ..........................................................................19

*Mancinas v. Pollard*,
  No. 18-cv-06235-YGR PR, 2020 WL 43266 (N.D. Cal. Jan. 3, 2020) .................18

*Meissner v. Paulson*,
  212 Cal. App. 3d 785 (1989) .....................................................................16, 17

*Meister v. Mensinger*,
  230 Cal. App. 4th 381 (2014) .........................................................................23

*Parks v. Dittmar (In re Dittmar)*,
  618 F.3d 1199 (10th Cir. 2010) ......................................................................21

*People v. Andrews*,
  165 Cal. App. 2d 626 (1958) ..........................................................................17

*People v. Mahdavi*,
  No. G033693, 2006 WL 711284 (Cal. Ct. App. Mar. 21, 2006) .........................17

*People v. McCarthy*,
  244 Cal. App. 4th 1096 (2016) .......................................................................18

*Pond v. Ins. Co. of N. Am.*,
  151 Cal. App. 3d 280 (1984) ..........................................................................15

*Prince v. Pac. Gas & Elec. Co.*,
  45 Cal. 4th 1151 (2009) .................................................................................14

*Rau v. Ryerson (In re Ryerson)*,
  739 F.2d 1423 (9th Cir. 1984) ........................................................................21

*Res-Care Inc. v. Roto-Rooter Servs. Co.*,
  753 F. Supp. 2d 970 (N.D. Cal. 2010) .......................................................24, 25

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
  473 U.S. 479 (1985) .......................................................................................18

*Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.*,
  255 Cal. App. 2d 300 (1967) ..........................................................................12

iv

*Unilogic, Inc. v. Burroughs Corp.*,
   10 Cal. App. 4th 612 (1992) ...................................................................................15, 16

*United States v. Levandowski*,
   3:19-cr-00377-WHA, Dkt. 87 .........................................................................................12

*United States. v. Levandowski*,
   No. CR-00377 WHA ..................................................................................................1, 2

*Uzyel v. Kadisha*,
   188 Cal. App. 4th 866 (2010) .........................................................................................23

*Valdez v. Superior Court of San Bernardino Cty.*,
   No. E070656, 2019 WL 1236932 (Cal. Ct. App. Mar. 19, 2019) ..................................20

*Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*,
   238 Cal. App. 4th 468 (2015) .........................................................................................12

*Waymo LLC v. Uber Techs., Inc.*,
   Case No. 3:17-cv-00939-WHA, Dkt. 2219 ...................................................................12

**Statutes**

11 U.S.C. § 502(b)(2) ..............................................................................................................10

11 U.S.C. § 523 ...................................................................................................................24, 25

18 U.S.C. § 1832 ........................................................................................................................1

Cal. Civ. Code § 3422 ..............................................................................................................12

Cal. Civ. Code § 3423 ..............................................................................................................12

Cal. Civ. Code § 2773 .........................................................................................................16, 17

Cal. Penal Code § 487(a) ..........................................................................................................17

Cal. Penal Code § 186.22(a) .....................................................................................................18

Cal. Penal Code § 484(a) ..........................................................................................................17

**Other Authorities**

Restatement (Second) of Agency § 403......................................................................................23

v

Anthony Levandowski was convicted and sentenced to federal prison for a felonious scheme that had at least two victims: Uber Technologies, Inc. ("**Uber**") and his former employer, Google, LLC ("**Google**"). Levandowski engaged in a theft of Google's autonomous vehicle trade secrets and secretly formed, funded, and operated a competing autonomous vehicle laser business, Tyto LiDAR, LLC ("**Tyto**"), during the last four years he was employed by Google.

Shortly after he left Google, Levandowski persuaded Uber to purchase a company that he formed called Ottomotto LLC ("**Otto**"). During those negotiations, Levandowski asked for indemnification, explaining that Google was litigious and might sue him out of spite. Uber agreed to do so, but conditioned the indemnity on, among other things, Levandowski not having engaged in any undisclosed misconduct while at Google and on his not taking or using any Google confidential information. Instead of telling Uber the truth, Levandowski falsely represented that he had not improperly taken any Google trade secrets and that he had no competing side businesses while at Google. As a result of those fraudulent representations and Levandowski's criminal trade secret theft, Uber was required to pay Google consideration worth $250 million to settle Google's claims that Levandowski had used the stolen trade secrets after joining Uber.

Levandowski's criminal misconduct is an adjudicated fact. On August 15, 2019, at Google's urging, Levandowski was indicted on 33 counts of theft and attempted theft of trade secrets. The indictment alleged that Levandowski downloaded documents from Google's servers intending to use those documents "to the economic benefit" of an entity other than Google. This directly contradicted what Levandowski had repeatedly told Uber.

On March 19, 2020, Levandowski pled guilty to one count of theft and attempted theft of trade secrets in violation of 18 U.S.C. § 1832(a)(1), (2), (3) & (4). (Plea Agreement ¶ 1, *United States. v. Levandowski*, No. 3:19-CR-00377-WHA (N.D. Cal. Mar. 19, 2020), ECF No. 77.) Levandowski admitted under oath in the plea agreement and before Judge Alsup that he downloaded a Google trade secret file "with the intent to convert [it] to the economic benefit of someone other than the owner. In particular, I intended to use the Chauffeur Tracking Document to benefit myself and Uber." (*Id.* ¶ 2.)

As this Court has noted, that admission is the "smoking gun" that proves "that Mr. Levandowski fraudulently concealed his true intent in obtaining and possessing that information: to

use it for his and Uber's benefit at Google's expense." [Dkt. 344 at 57.] In accepting his guilty plea, Judge Alsup commented, "This was the biggest trade secret crime I have ever seen …. [T]here's no doubt in my mind, the reason he stole [the 14,000 files] on December 11th, 2015 was to have [them] at the ready in case he needed [them] when he landed on his feet outside of Waymo." (Tr. of Proceedings at 72-73, *United States v. Levandowski* (N.D. Cal. Aug. 4, 2020), ECF No. 102.) But for a last-minute pardon from former President Trump, Levandowski would be in federal prison today.

Levandowski now seeks to compound the damage he inflicted on Uber by seeking to force Uber to pay Google *a second time* for his own wrongful conduct. At trial, Levandowski will claim that he is entitled to be indemnified against Google's $179 million judgment ordering him to disgorge his entire $126 million bonus (plus interest). In other words, Levandowski—who reported approximately $60 million in assets on his bankruptcy schedules and also deposited an additional $7 million into a spendthrift trust for himself (in total, roughly the amount of compensation he received from Google after income taxes—seeks to retain the compensation he never should have received in the first place and foist liability for all of his misconduct onto Uber. However, as set forth herein, neither the facts nor the law supports a recovery on Levandowski's two remaining contract claims (Counts II and III). Uber will also establish at trial that its proof of claim, which seeks recovery of all of the amounts it was forced to pay on account of Levandowski's wrongful conduct, should be allowed (Count X) and that its claim should be found non-dischargeable (Counterclaims VI, VII, IX and X).

**SUMMARY OF FACTS TO BE PROVEN AT TRIAL**

A.     **The Operative Contract—The April 16, 2016 Indemnification Agreement.**

On April 16, 2016, as part of Uber's agreement to acquire Otto, Uber, Levandowski, and other Otto employees entered into the indemnification agreement (the "**Agreement**") that is the subject of this adversary proceeding. Contrary to Levandowski's arguments, the Agreement was not intended to be a get-out-of-jail-free card for past misconduct or a license to harm Google in the future. Instead, before entering into the Agreement, Uber required Levandowski to certify he had not committed any undisclosed pre-signing bad acts, to undergo a confirmatory due diligence review conducted by an independent firm jointly retained by Uber and Otto, and to promise he would not engage in any post-signing bad acts.

2

On March 4, 2016, counsel for Uber and Otto jointly retained Stroz Frieberg ("**Stroz**"), a third-party forensic examiner, to confirm the truthfulness of Levandowski's certification that he and other principals of Otto had not committed any "Pre-Signing Specified Bad Acts." Uber also required Levandowski and Otto's other principals to certify that they provided complete and truthful cooperation and responses to Stroz, and the preambles to the Agreement acknowledged that these representations and the investigation were a "material inducement" to Uber to sign the Agreement.

In addition to the pre-signing certifications, the Agreement contained several key provisions to ensure that Levandowski would not bring any Google confidential information with him to Uber and had not engaged in undisclosed misconduct while at Google. *First*, Uber required Levandowski to agree that the Agreement would be nullified as to Levandowski if, among other things, he transferred or caused others to transfer Google confidential information to Uber (a "**Post-Signing Bad Act**") and such Post-Signing Bad Act was the subject of a "Former Employer" Claim. (Agreement, § 2.1(a) and Ex. A at 1 and § 2.C.) *Second*, Uber required Levandowski to agree that he would not be indemnified for claims based on any Pre-Signing Bad Acts that he did not truthfully disclose to Uber (the "**Excluded Claim**" provision). (*Id.*, § 2.1(b)(ii).)

**B.     The Allegedly Indemnified Claim—The Arbitration Panel's Award.**

Levandowski alleges that Uber breached the Agreement by failing to indemnify him from a judgment entered on March 4, 2020 in favor of Google in the amount of $179,047,998.64. The basis of this judgment is a Corrected Final Award that a JAMS Arbitration Panel entered on December 23, 2019 (the "**Award**"). Because the Award is the basis of Levandowski's indemnification demand, the findings in the Award are determinative for purposes of deciding whether the Award is indemnifiable. *Cleghorn Bar Enters. V. Garlock*, No. A114398, 2008 WL 77584, at *3 n. 7 (Cal. Ct. App. Jan. 8, 2008) (holding "it would not be possible to decide this case without looking to the basis for the award, since the central question is whether or not the indemnity agreement covered the conduct").

The Award found Levandowski liable for breach of his Google employment contracts and his duty of loyalty as an employee, and for unfair competition based on two sets of misconduct: the "**Tyto Misconduct**" and the "**Otto Misconduct**." (Award, 31-40.) It ordered Levandowski to disgorge all of his compensation received during the time period covering both sets of misconduct but found that

Case: 20-03050    Doc# 404    Filed: 01/24/22    Entered: 01/24/22 21:05:13    Page 9 of 32

Google had not proved that it suffered any actual competitive harm damages.[1] (*Id.*, 92-99.)

### 1.     The "Tyto Misconduct."

The Panel held that Levandowski's employment agreements and his duty of loyalty as an employee precluded him from engaging in side businesses that competed with Google. (*Id.*, 42-62, 66-86.) Levandowski had worked on and came to lead Google's self-driving car project, called "Project Chauffeur." The Panel found that at the same time he was employed at Google, starting "as early as May 2012, and at least by August 2012," Levandowski "created, financed, and provided technical support" to a company that became known as Tyto. (*Id.*, 46.) The Panel concluded that Tyto competed with Google because Tyto was engaged in developing a lower-cost LiDAR sensor and LiDAR sensors are a critical component of the technology that Google also was developing as part of its self-driving car project, Project Chauffeur. (*Id.*, 46-47.)

The Panel also found that, at the same time as Levandowski headed Google's LiDAR team, he engaged his personal attorney, John Gardner, to draft the legal documents to create Tyto. (*Id.*, 32.) Gardner created a limited liability company, Sandstone LLC, which became the owner of Tyto. (*Id.*, 33.) Based on the arbitration testimony of Google's expert, John Hartog, which has been admitted by stipulation in this case, the Panel found that Levandowski created two Alaskan trusts, called the Bismuth and Beryllium Trusts and funded them with several million dollars, and the trusts in turn purchased ownership interests in Sandstone LLC, which owned Tyto. (*Id.*) As Hartog testified and as the Panel found, Levandowski "was the major, if not only, source of funding for Tyto," funneling over $2.5 million into Tyto through his two trusts and loaning Tyto $925,000. As Hartog further explained and the Panel found, the only purpose for routing these moneys through two Alaskan trusts and Sandstone was to hide the fact that Levandowski was funding Tyto. (*Id.*, 33.)

Levandowski selected and recruited Tyto's CEO, Brent Schwarz, and its lead engineer, James Haslim. (*Id.*, 32-33.) He approved the original business plan for Tyto and Schwarz' long-term goals, which Schwarz described as "to generate revenue and to find buyers to acquire your [Levandowski's]

---

[1] The panel also awarded $1.25 million in damages equal to retention bonuses that Google paid to retain employees that Levandowski and his business partner, Lior Ron, tried to solicit to Otto. This amount of the Award was paid when Uber satisfied its indemnity in favor of Levandowski's co-defendant Ron. Thus, this part of the Award is only relevant to Uber's claim for equitable indemnity or contribution against Levandowski.

4

company." (*Id.*) Levandowski also provided technical and logistical support to Tyto. (*Id.*, 46.) He was instrumental in developing Tyto's LiDAR technology, including outlining key technical tasks, drawing schematics for lasers, and providing "detailed information concerning where to procure the parts necessary to build the laser." (*Id.*, 33, 47, 67.) Waymo (as successor to Google) would later contend, through expert reports submitted in the Waymo litigation, that the Tyto LiDAR reflected Google trade secrets and confidential information.

Levandowski continued his clandestine operation of Tyto from the time he formed it in mid-2012 through the end of his tenure at Google in January 2016 and beyond. During that time, he directly lied to Google when asked about his involvement in Tyto. As Alex Cooper's arbitration testimony establishes, Levandowski assisted Google in evaluating Tyto's technology and deciding whether it should purchase Tyto while concealing that it was his own company. (*Id.*, 34.)

### 2. The "Otto Misconduct."

The Panel found that Levandowski also breached his Google employment agreement and duty of loyalty when he created a company that eventually became known as Otto to develop LiDAR technology for autonomous trucking and self-driving cars, and then negotiated with Uber in the fall of 2015 for Otto to become Uber's sole supplier of LiDAR technology. (*Id.*, 47-48.) The Panel also found that Levandowski's solicitation of Google employees to join Otto in December 2015 and January 2016 also breached Levandowski's employment agreement and his duty of loyalty. (*Id.*, 48-51, 68.)

### C. Evidence Establishing That Levandowski Is Not Entitled To Indemnification For The Arbitration Award.

#### 1. Levandowski Lied To Stroz, Making Any Claim Based On His Tyto Misconduct An Excluded Claim.

Before Uber signed the Agreement, on March 22 and 23, 2016, Stroz examiners asked Levandowski to identify all "side projects," "side businesses," "jobs," or "work" that he engaged in while employed at Google. Levandowski responded that it was common for Google employees to have side projects, and falsely represented that Google was aware of, and approved, all of his external side projects. This was untrue because Google had not approved of Tyto. The outline of the interview prepared by Stroz examiner Mary Fulginiti Genow reflects that she asked Levandowski, "To what extent did you perform work for any other companies during your employment with Former

5

Employer?" "What did you do? Did it relate to your work for Former Employer?" and "While working for Google, did you ever engage in any other business, activities or services similar to Google?" Notes of the interview reflect that she asked about any "side work/projects" and "everything [he] did[,] not related to what [he] did at Google." And the memo Stroz interviewers prepared to summarize the interview shows that in response to these questions, Levandowski identified nine side projects—but he did not identify the only relevant one, Tyto. Levandowski himself admits that he did not tell Stroz about his secret ownership, control, and operation of Tyto. Stroz relied on his answers in developing the search terms for Stroz' forensic review of Levandowski's devices; Stroz included in those terms the names of all the side businesses that Levandowski had disclosed to Stroz, but did not include "Tyto" and "Odin Wave" (the original name of Tyto), because it had no knowledge of those entities.

Levandowski also concealed and lied about his theft of Google confidential information. Uber executives told Levandowski they "absolutely d[id not] want any third-party IP, Google or otherwise" at Uber, and Levandowski "assured [them] he would not bring or download anything." When Stroz interviewed Levandowski and found Google files on his laptop, Levandowski said that "he kept Google files on his personal Apple MacBook Pro laptop to conduct his work [for Google]." Levandowski further stated that he had never downloaded any Google files to his personal devices with the intention of leaving Google, and that he "w[ould] not rely on any information or data from Google." He claimed that the Google documents on his devices were there innocently or even accidentally, pursuant to legitimate and permitted activities when he worked for Google; that he had by no means stolen them; and that he had no intent to use them at Uber or elsewhere.

At the end of his interview with Stroz, Levandowski attested that all the information he provided in the interview was true and correct. In addition, on April 11, 2016, Levandowski signed an attestation in which he swore:

> I have provided good faith, complete and truthful responses in all material respects to Stroz' questions and (b) all of the information I have provided to Stroz is true and correct in all material respects.

> I have provided to Stroz copies of and/or otherwise advised Stroz of any agreements or other obligations to which I am subject with 'Former Employer' … (collectively, 'Agreements'), and subject to any matters or information disclosed to Stroz, I have complied with my obligations under any Agreements.

6

Contrary to those attestations, Levandowski did not disclose to Stroz (i) his involvement in Tyto, which breached several fiduciary, contractual, and statutory duties and obligations to Google, and (ii) that he had taken Google's confidential information for his personal benefit.

**2.** **After The Agreement Was Signed, Levandowski Secretly Caused Google IP To Be Transferred To Uber, Thereby Committing Post-Signing Bad Acts And Voiding The Agreement.**

Levandowski committed at least two Post-Signing Bad Acts that were the subjects of a Former Employer Claim: the transfer of the code for Google's "planner" and certain confidential information related to its LiDAR technology. Both Bad Acts were the subject of a Former Employer Claim.

**a.** **The Waymo Lawsuit Is A "Former Employer Claim."**

On February 23, 2017, Google's affiliate, Waymo LLC ("**Waymo**"), filed suit against Uber, Otto, and Otto Trucking, LLC, for trade secret misappropriation by Levandowski. The Waymo Lawsuit is a Former Employer Claim because it is an action against two indemnified parties—Otto and Otto Trucking—brought by a "Former Employer"—Waymo. There can be no dispute about this; when Levandowski sought indemnification from Uber for his criminal indictment, Levandowski himself claimed that Waymo's suit was a "Former Employer Claim."

Waymo is a "Former Employer" even though Levandowski never technically worked for Waymo (Levandowski worked on Project Chauffeur when it was housed within Google, but it was later spun off into a separate entity, Waymo). That is because the Agreement defines a "Former Employer" to include "Affiliates" of any "Person" that "such Employee has previously ... provided services to as an employee...." (Agreement, § 1.) Uber, Google, Levandowski, and non-party Waymo have stipulated that Waymo is a Google Affiliate: "[f]rom its inception on August 5, 2016 to date, Waymo LLC ... has been a controlled subsidiary of Alphabet Inc.," and "[f]rom its inception until September 30, 2017, Waymo LLC was also a controlled subsidiary of Google Inc. (which was renamed Google LLC on September 30, 2017 and is also a controlled subsidiary of Alphabet Inc.)." [Dkt. 102 at 2.] Accordingly, Google and Waymo are and were "Affiliates" within the meaning of the Ottomotto Merger Agreement and the Agreement. (Ottomotto Merger Agreement Ex. A ("Affiliate" definition); Agreement § 1 ("Definitions").) Because Waymo is an Affiliate of Google, and Google was a former

employer of Levandowski, Waymo meets the definition of a "Former Employer" of Levandowski. (*Id.* § 1 ("Former Employer" definition).)

Under the Post-Signing Bad Act provisions, any Indemnified Person, including Levandowski, forfeits the right to indemnification for all purposes if a Final Judgment (to be entered in this case) determines that he committed a Post-Signing Bad Act that was the subject of a Former Employer Claim against any other Indemnified Person. Two of Waymo's trade secret allegations against Otto and Otto Trucking (both Indemnified Persons) established Post-Signing Bad Acts that Levandowski directed or caused: (i) the transfer of the "planner code" that was the subject of Dr. Gerdes' independent analysis; and (ii) the transfer of Google confidential LiDAR information through the sale of Tyto to Otto.

### b. Levandowski's Transfer Of The Planner Code.

One of Waymo's claims against Uber, Otto, and Otto Trucking related to the allegation that in May 2016, Otto Transferred a certain planner code to Uber and that the planner code allegedly included Google trade secrets. As discussed below, Mr. Levandowski's directive to transfer this code constitutes a Post-Signing Bad Act.

As part of the settlement agreement in the Waymo case, Uber agreed with Waymo to jointly engage an independent, leading autonomous-vehicle expert, Dr. J. Christian Gerdes, to determine whether Uber's technology incorporated any of a number of Google's trade secrets. Dr. Gerdes conducted an extensive analysis, receiving multiple written submissions from Waymo and Uber, interviewing several witnesses, and reviewing highly proprietary source code and technology for both Waymo's and Uber's autonomous-vehicle programs. He concluded, in a binding and non-appealable expert analysis to which he will testify in this case, that the planner code that Levandowski caused to be transferred from Otto to Uber in May 2016 (before Uber acquired Otto), contained a Google trade secret.[2] Prior to Dr. Gerdes' analysis, Uber had no knowledge that this intellectual property, which Otto's employees asserted they had developed independently, in fact reflected Google trade secrets.

---

[2] In the context of autonomous vehicles, the "planner" is the software that determines the vehicle's speed and trajectory.

8

Levandowski directed those Otto employees to send Otto's planner code to Uber for incorporation into Uber's autonomous vehicle technology. Jur Van den Berg will testify that he sent the code only because Levandowski directed him to do so, as an "advertisement" for why Uber should close its pending acquisition of Otto.

### c. Levandowski's Transfer Of Confidential Google Information Related To LiDAR Technology.

The second relevant Post-Signing Bad Act was Levandowski's conduct in causing Otto to acquire Tyto in May 2016. In its lawsuit, Waymo alleged that Tyto's LiDAR technology reflected the same LiDAR technology that Google was using and that constituted Google confidential information.

In the lead-up to Uber's acquisition of Otto, Levandowski urged Uber to allow Otto to acquire Tyto. When Uber was deciding whether to grant the permission required under the Otto merger agreement, it had no idea that Tyto was a company Levandowski controlled and that the approval could ultimately lead Uber to inadvertently acquire technology that was developed using Google's confidential information at Levandowski's direction. In response to Uber's inquiries about Tyto's ownership, Levandowski told Cameron Poetzscher, Uber's vice-president of corporate development, that "one guy had nearly all of [Tyto]" without telling Uber he (Levandowski) was the "one guy." Relatedly, Levandowski also concealed his involvement in developing Tyto's LiDAR technology.

### D. Levandowski's Alleged Damages.

Levandowski asks for damages equal to the Award plus unspecified consequential damages and pre-judgment interest. As set forth below, Levandowski is not entitled to any damages because the Agreement is void based on his commission of Post-Signing Bad Acts. Further, as set forth in Uber's separate *Motion In Limine Barring Evidence And Argument In Support Of Plaintiff's Alleged Consequential Damages Claim* [Dkt. 391], neither the Agreement nor the evidence supports the request for consequential damages. In addition, because interest is not running on Google's judgment due to the bankruptcy filing (*see* 11 U.S.C. § 502(b)(2)), the Agreement, which limits a recoverable "Expense" to "interest ... that is out-of-pocket," also bars the imposition of pre-judgment interest.

In the event the Court finds that Levandowski is entitled to some indemnification, it will be necessary to determine how much of the Google judgment is indemnifiable. The Panel ordered

9

Levandowski to disgorge all monetary compensation he received between August 2012 and January 27, 2016, consisting of $767,051.95 in salary and $126,544,500 in deferred compensation received pursuant to the Project Chauffeur Bonus Plan (the "**Plan**"). As the Award reflects, the Tyto Misconduct occurred during the entire 44 months that the deferred compensation was earned. The Otto Misconduct overlapped with the Tyto Misconduct only for the last four months of that 44-month period.



Case: 20-03050    Doc# 404    Filed: 01/24/22    Entered: 01/24/22 21:05:13    Page 16 of 32

1
2
3
4
5

6  **E.      Uber's Proof Of Claim.**

7    The evidence will establish that Uber's proof of claim should be allowed and it has offset

8  rights amounting to at least $270,241,203.31. The evidence is undisputed that Uber paid: (i) $250

9  million in consideration to Google for Levandowski's misconduct; (ii) $9,453,135.87 to indemnify

10 Lior Ron; and (iii) $10,788,067.41 in attorneys' fees and costs on Levandowski's behalf.

11   Levandowski's criminal theft of trade secrets was at the heart of the Waymo case and the

12 primary reason why Uber paid $250 million (as well as agreed to Dr. Gerdes' independent review) to

13 settle that case. Levandowski cannot reasonably complain that the settlement was "too rich," when his

14 criminal misconduct made the case very difficult to defend, and his invocation of the Fifth Amendment

15 and continued lies to Uber about his theft of trade secrets only compounded that difficulty. Initially,

16 Levandowski assured everyone at Uber that he had not taken any trade secrets to use at Uber. In an

17 Uber "all hands" meeting soon after Waymo filed suit, Levandowski claimed he downloaded

18 information while at Google in order to work from home. Later, he told Uber he had downloaded some

19 files because "he was worried that Google was not going to pay him his bonus and he wanted to be

20 able to demonstrate the work he had done in order to earn that bonus." Uber relied upon those

21 continued lies.

22   Levandowski's trade secret theft created significant exposure for Uber. Judge Alsup, who

23 presided over the case, granted Waymo's motion for preliminary injunctive relief early in the case,

24 noting that Waymo "ha[d] show[n] compelling evidence that ... Anthony Levandowski, downloaded

25 over 14,000 confidential files from Waymo immediately before leaving his employment there[,]" that

26 "Levandowski had taken and retained possession of Waymo's confidential files[,]" that the "files

27 likely contain[ed] at least some trade secrets[,]" and that "provisional relief [was] warranted." He also

28 observed that Waymo's decision to sue only Uber, and not Levandowski, was merely a strategic choice

11

to avoid having to arbitrate the case. (*Waymo LLC v. Uber Technologies, Inc.*, Case No. 3:17-cv-00939-WHA, Dkt. 2219.) Even Levandowski admitted that "[a]lthough [he] was not a party to Google/Waymo's lawsuit, *he was unquestionably at its center*" because "Google's case was premised on its allegation that, when Levandowski chose to leave Project Chauffeur, he stole some 14,000 files, representing 'billions' of dollars in value, with the intent of replicating Google's LiDAR devices at Uber." (*See United States v. Levandowski*, 3:19-cr-00377-WHA, Dkt. 87 (emphasis added).) Principally because of Levandowski's misconduct, and not because of any misconduct of its own, Uber was required to pay Waymo (as successor to Google) $250 million to settle the case. Under basic principles of equitable indemnity, Levandowski should bear full responsibility for that loss and at a minimum should be held liable for at least 90% of the loss.

## LEGAL THEORIES ON WHICH UBER RELIES

In his two remaining claims after summary judgment—Counts II and III—Levandowski alleges that Uber is in breach of the Agreement; in Count II he seeks "specific performance" and in Count III he seeks contract damages. Levandowski's claim to specific performance should be easily rejected. "Specific performance of a contract will not be compelled when an adequate remedy exists at law, and if monetary damages afford adequate relief and are not extremely difficult to ascertain, an injunction cannot be granted." *Thayer Plymouth Ctr., Inc. v. Chrysler Motors Corp.*, 255 Cal. App. 2d 300, 306 (1967) (citing *Morrison v. Land*, 169 Cal. 580 (1915)); *accord* Cal. Civ. Code § 3422(1)-(2); Cal. Civ. Code § 3423(e). Here, by seeking a "precise amount of money" in "indemnity" from Uber, Levandowski "disclosed the legal remedy of damages was adequate" and he therefore is "not entitled to specific performance." *Valley Crest Landscape Dev., Inc. v. Mission Pools of Escondido, Inc.*, 238 Cal. App. 4th 468, 492 (2015) (holding plaintiff could not seek specific performance of indemnification agreement); *In re Branford Partners, LLC*, No. SV 06-12551-KT, 2008 WL 8448329, at *15 (B.A.P. 9th Cir. Oct. 24, 2008) (party was not entitled to specific performance after it "made a specific demand for recovery of monetary damages"). Accordingly, Count II should be dismissed.

Both Counts II and III also fail for the additional reasons set forth below.

Case: 20-03050   Doc# 404   Filed: 01/24/22   Entered: 01/24/22 21:05:13   Page 18 of 32

## I. The Agreement Is Void.

### A. Levandowski's Multiple Post-Signing Bad Acts (Affirmative Defense 4 and Counterclaim III).

The Agreement's Post-Signing Bad Acts provision nullifies Levandowski's right to indemnification. Agreement Section 2.1(a) provides that if any Diligenced Employee (of which Levandowski was one) is found to have committed a Post-Signing Bad Act that was the subject of a "Former Employer Claim," then "Purchaser's indemnification obligation to [that person] pursuant to this Agreement *shall immediately become null and void* and of no further force and effect ...." (Agreement, § 2.1(a) (emphasis added).) The definition of a Post-Signing Bad Act includes inducing or directing another person to "transfer[] ... any ... electronic copy, or any other form of confidential document, file, data or information of any Former Employer [here Google] ... without the express written consent of such Former Employer." (*Id.*, Ex. A at 1; § 2.C.)

Section 2.1(a) was intended to provide a fire wall that would protect Uber in the event any Diligenced Employee had misappropriated Google proprietary information. This important provision also incented Levandowski not to encourage or direct another person to share Google confidential information with anyone at Uber.

The evidence will establish that Levandowski committed at least two Post-Signing Bad Acts: (i) he "directed, caused, and [or] induced" Jur van den Berg to send Uber the planner code in May 2016 and (ii) he urged Uber to let Otto acquire Tyto, resulting in Uber's ultimate possession of Google confidential information related to the LiDAR technology. Both of these Bad Acts occurred after the Agreement was signed, became the subject of a Claim by a Former Employer, and involved conduct— the improper transfer of confidential information—that the Agreement prohibited. Thus, they each meet the definition of a Post-Signing Bad Act and result in the Agreement becoming "null and void." (Agreement, § 2.1(a).)

Levandowski has no serious defense to his commission of these Post-Signing Bad Acts. As to the planner, Levandowski may contend that he, like Uber, did not know the planner code contained Google confidential information. Regardless whether that is true, the Agreement allocates that risk of ignorance to Levandowski, who was in the best position to protect against a Post-Signing Bad Act.

13

Further, California law supports the allocation that the parties agreed to, because California law disfavors private indemnification agreements and strictly construes them against the indemnitee. *Prince v. Pac. Gas & Elec. Co.,* 45 Cal. 4th 1151, 1158 (2009) (citing *Crawford v. Weather Shield Mfg. Inc.,* 44 Cal. 4th 541, 552 (2008)). The protection Uber bargained for includes the nullification of all indemnification for any otherwise Indemnified Person (here Levandowski) who "directed, caused, induced, knowingly contributed to, or knowingly permitted" someone else to engage in a prohibited transfer. (Agreement, 1.) Thus, the definition explicitly includes both knowing and unknowing conduct. As between Levandowski and Uber, the risk allocation was reasonable: Levandowski, as former leader of Google's Project Chauffeur and head of Otto, was in a far better position than Uber to investigate and determine whether the code that he directed Van den Berg to transfer contained Google confidential information and whether Tyto's technology reflected Google confidential information.

Likewise, Levandowski cannot argue that Uber should have known of his misconduct, because reliance is not an element of Section 2.1(a) for the basic reason that it governs conduct *after* the Agreement was executed. Accordingly, the Court should enter judgment for Uber on Levandowski's breach of contract claims (Counts II and III) and Uber's Affirmative Defense 4 and Counterclaim III.

Finally, while Levandowski may argue that Uber willingly accepted the planner code, he cannot establish that Uber gave "prior written consent" to the May 10, 2016 transfer of Google confidential information (in the planner code), as is his burden under Appendix A of the Indemnification Agreement.  To the contrary, Uber had made clear that it didn't want any Google IP and Levandowski didn't tell Uber that the Planner code contained Google IP.  In fact, it was not until much later, when Waymo claimed the Planner incorporated its trade secrets, that this issue even arose.

### B.      Levandowski's Unclean Hands (Affirmative Defense 8).

Levandowski's criminal misconduct and fraud also present a paradigm case for applying the doctrine of unclean hands. Simply put, Levandowski should not benefit from a contract that he procured through fraud. Under California law, unclean hands is a complete defense to a legal claim for breach of contract. To prevail on unclean hands, Uber need only show Levandowski acted in "bad faith, or inequitabl[y]" in connection with the Agreement. *See Fladeboe v. Am. Isuzu Motors Inc.*, 150

14

Cal. App. 4th 42, 56 (2007).

Here, Levandowski's inequitable misconduct relates "directly to the transaction concerning which the complaint is made," specifically, the Agreement that he procured by concealing his massive felony trade secret theft and clandestine control of Tyto. *Pond v. Ins. Co. of N. Am.*, 151 Cal. App. 3d 280, 289-90 (1984). With unabashed hubris, Levandowski comes before the bankruptcy court seeking to use the Agreement as a means to retain $127 million-plus in deferred compensation that he was not entitled to receive and that he has been ordered to disgorge to Google. Foisting responsibility on Uber to pay Google, so that Levandowski can keep the economic benefit of fraudulently procured monies to which he has no entitlement, would be inequitable in the extreme. Indeed, it would defeat the very purpose of disgorgement, which is not to compensate the victim, but rather "to deprive the wrongdoer of his ill-gotten gain." *Federal Trade Commission v. Neovi, Inc.,* No. 06-CV-1952 JLS (JMA), 2009 WL 10672945, at *2 (S.D. Cal. May 18, 2009).

Analogous cases have applied the doctrine of unclean hands to bar breach of contract claims based on the plaintiff's prior misconduct, including the plaintiff's dishonest conduct in procuring the contract in the first place. *See, e.g., Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 620-21 (1992) (applying unclean hands doctrine in action for breach of joint development project). Courts have found unclean hands based on misconduct far less egregious than Levandowksi's brazen and extensive fraud and theft. For example, where an investor concealed facts about his conveyance of and ownership interest in a property, his behavior was not found to be fraudulent but nonetheless constituted inequitable conduct that barred him from recovering on a contract. *See DeRosa v. Transamerica Title Ins. Co.*, 213 Cal. App. 3d 1390, 1396 (1989) ("The doctrine does not require the party seeking relief to be guilty of fraud; it is sufficient if he merely acted unconscientiously."); *see also Pond*, 151 Cal. App. 3d at 291 ("[a]ny unconscientious conduct ... [by a party] which is connected with the controversy [before the court]" is sufficient).

The scope and gravity of Levandowski's misconduct in procuring the Agreement is beyond dispute. This Court has already stated that Levandowski's guilty plea is "smoking gun" evidence "that Mr. Levandowski fraudulently concealed his true intent" in stealing Google trade secrets. [Dkt. 344 at 56.] The Court also ruled that Levandowski made "patently false" misrepresentations to conceal his

ownership and control of Tyto [*id.*, 37], and answered with "explicit lies in response to Stroz' direct questioning." [*Id.,* 66]. And, as discussed below, Levandowski's conduct in obtaining the $127 million in deferred compensation under false pretenses also was felonious.

During the very time that he was negotiating the Agreement in early 2016, Levandowski was committing what Judge Alsup described as "the biggest trade secret crime I have ever seen." Levandowski was rightfully concerned that his $127 million in deferred compensation from Google would not be paid if Google discovered either his Tyto fraud or his massive theft of trade secrets. As part of his scheme to retain the economic benefits of this ill-gotten $127 million, he fraudulently induced Uber to indemnify him, including by representing that "bad feelings between him and Google management" might result in a "retaliatory legal action" by Google. This Court ruled in denying summary judgment that "[t]he record strongly indicates that Mr. Levandowski made material misrepresentations of fact [to Uber] with respect to his relationship to Tyto and his intent in possessing Google/Waymo confidential information." [*Id.*, 84.] The trial record will conclusively establish his material misrepresentations.

Levandowski's inequitable conduct persisted as Uber determined whether to close the acquisition of Otto. After the Agreement was signed, Levandowski caused Otto to acquire Tyto, still concealing from Uber his control of Tyto. He also caused Otto to transfer to Uber source code for the planner that contained purloined Google trade secrets. This continued inequitable conduct "affect[ed] the equitable relationship between the litigants" and bars Levandowski from collecting here. *Unilogic*, 10 Cal. App. 4th at 621. Accordingly, the Court should enter judgment for Uber on Levandowski's breach of contract claims (Counts II and III).

## C. Levandowski's "Knowingly Wrongful Conduct" Precludes Indemnification (Affirmative Defense 3).

California Civil Code Section 2773 bars private agreements to indemnify someone for future conduct that is "known ... to be unlawful." Similarly, Section 2774 prohibits indemnification of past wrongful conduct, if it is established, to a civil standard of proof, that the conduct was felonious. *See Meissner v. Paulson*, 212 Cal. App. 3d 785, 788-89 (1989) (relying upon §2774 to deny indemnification claim even though no felony charges were ever brought). "Both section 2773 and

16

section 2774 are intended to prevent the encouragement of illegal acts," and "when both past and future acts are covered by an indemnity agreement, section 2773 should apply." *Lemat Corp. v. Am. Basketball Ass'n*, 51 Cal. App. 3d 267, 279 (1975).

Levandowski's course of wrongful conduct in obtaining a bonus to which he knew he was not entitled is quintessential "knowingly wrongful conduct." Levandowski took affirmative acts to conceal his misconduct, which was so "pervasive and antithetical to his duties to Google" that the Panel found it required return of all of his compensation. (Award, 93.) Levandowski undisputedly knew that his trade secret theft and Tyto misconduct was wrongful—and for that reason went to great lengths to conceal that misconduct both from Google and Uber. Indisputably, part of his motivation for concealing that misconduct was his desire to obtain the $127 million in deferred compensation that Google paid him in two installments, in December 2015 and August 2016. Because Levandowski engaged in knowingly wrongful conduct in procuring these bonus payments under false pretenses, Section 2773 precludes indemnification for the disgorgement of those bonus payments.

Indeed, even though it is only necessary to prove "knowingly wrongful conduct" under Section 2773, Levandowski's misconduct was so egregious it also qualifies as felonious misconduct that precludes indemnification under Section 2774. Obtaining his bonus under false pretenses was grand theft, which is a felony under California law. California Penal Code Section 484(a) states that "Every person who shall ... knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money ... is guilty of theft." And that theft constitutes "grand theft," which is presumptively a felony, when the amount taken exceeds $950. Cal. Penal Code § 487(a).

California courts have recognized that obtaining compensation under false pretenses is a felony. *See, e.g., People v. Mahdavi,* No. G033693, 2006 WL 711284, at *1-2 (Cal. Ct. App. Mar. 21, 2006) (employee committed felony grand theft when she obtained a $5,000 bonus under false pretenses by concealing that she failed her CPA examination); *People v. Andrews,* 165 Cal. App. 2d 626, 638-39 (1958) (same); Cal. Penal Code § 484(a) (offense encompasses theft by false pretenses). And it is no defense for Levandowski to claim that he was not *charged* with a felony for receiving his two deferred compensation payments under false pretenses. Section 2773 does not require felonious conduct, and Section 2774 does not require a criminal charge or conviction. In *Meissner*, a California

Case: 20-03050   Doc# 404   Filed: 01/24/22   Entered: 01/24/22 21:05:13   Page 23 of 32

Appellate Court applied Section 2774 to bar indemnification, even though the arsonist who set a building on fire was never charged. 212 Cal. App. 3rd at 788-89. *Meissner* is consistent with a long line of California court decisions recognizing that unless a statute explicitly requires a felony "conviction," courts should not read such a requirement into the statute. In *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1049 (2013), for example, the court awarded treble damages in a civil case based on Penal Code Section 496 even though the defendant was never convicted in a criminal case, holding that "[i]t is not this court's role to replace the word 'violation' with the word 'conviction' in the statute."[3]

Accordingly, judgment should be entered against Levandowski and in favor of Uber on Counts II and III and Affirmative Defense 3.

### D. Public Policy And The Agreement Bar Indemnification For A Disgorgement Award (Affirmative Defenses 1 and 2, Counterclaim 1).

Both as a matter of the Agreement and of California law, Levandowski also cannot recover because the basis of the Award is disgorgement of compensation that he received from Google.

Section 2.4(b) of the Agreement requires the Court to deduct from any indemnified amount (termed an "Expense" under the Agreement) "an amount equal to the amount of any proceeds actually received by any Indemnified Person from ... any other third parties in connection with such Expense." Here, Levandowski received a payment from a third party—Google—equal to the amount of the compensation he was required to disgorge and for which he seeks indemnity. Thus, under the Agreement, Uber is not required to indemnify Levandowski for the $127.3 million he received from Google or the related prejudgment interest of $45.5 million. When those amounts are eliminated from the Award and one subtracts the amounts that Uber paid on behalf of co-defendant Ron, the only remaining unpaid, indemnifiable part of the Award is the separately awarded attorneys' fees of $1,869,596.27 and costs of $57,468.38.

---

[3] *Accord Mancinas v. Pollard*, No. 18-cv-06235-YGR PR, 2020 WL 43266, at *5-7 (N.D. Cal. Jan. 3, 2020) (court reasoned that California Penal Code Section 186.22(a) applies to a defendant "who willfully promotes, furthers, or assists in any felonious criminal conduct," and thus does "not require a conviction"); *People v. McCarthy*, 244 Cal. App. 4th 1096, 1107 (2016) (same); *see also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 488 (1985) (refusing to read a conviction requirement into the RICO statute where "[t]he word 'conviction' [did] not appear in any relevant portion of the statute").

18

In addition, as set forth more fully in Uber's Rule 12(c) Motion [Dkt. 70], the California Supreme Court has held that public policy prohibits indemnification for disgorgement of wrongfully obtained monies. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1269 (1992). The clear "public policy rationale" behind this rule is that "[w]hen the law requires a wrongdoer to disgorge money or property acquired through a violation of the law, to permit the wrongdoer to transfer the cost of disgorgement to an insurer would eliminate the incentive for obeying the law." *Id*. "Otherwise, the wrongdoer would retain the proceeds of his illegal acts, merely shifting his loss to an insurer." *Id.* (citations omitted). Stated differently, "[a]n insured incurs no loss within the meaning of the insurance contract by being compelled to return property that it had stolen, even if a more polite word than 'stolen' is used to characterize the claim for the property's return." *Level 3 Commc'ns, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 911 (7th Cir. 2001).

Here, there can be no dispute the Award against Levandowski was an order of disgorgement (Award, 93), the purpose of which was to "deprive [Levandowski] of [his] ill-gotten gains." *Federal Trade Commission v. Lucaslaw Ctr.*, *Inc.*, No. SACV 09-0770 DOC (ANx), 2010 WL 11506885, at *8 (C.D. Cal. June 3, 2010). Thus, if the Court enters any judgment here, the amount should be at most limited to the separately awarded attorney's fees and costs totaling $1,927,064.65.

## II.    Most Of The Award Is For An Excluded Claim, For Which Uber Has No Obligation to Provide Indemnity (Affirmative Defenses 5 and 9 and Counterclaim IV).

Even if the Agreement is not void, Levandowski still is not entitled to indemnification for most of the Award because the Award is primarily based on an Excluded Claim—his Tyto Misconduct. Section 2.1(b)(ii) of the Agreement precludes indemnification for an "Excluded Claim." An Excluded Claim includes any claim arising out facts that "***either*** (A) were not truthfully disclosed by [Levandowski] to [Stroz] in response to relevant inquiries in connection with the due diligence performed by [Stroz] ***or*** (B) were not contained or reflected in the due diligence materials provided by [Levandowski] to [Stroz]." (Agreement, § 2.1(b)(ii) (emphasis added).)

The use of the disjunctive terms "either" and "or" means that only one of (A) *or* (B) need be satisfied in order for a claim to be an Excluded Claim. It is a well-established principle of contract construction that an "either" "or" disjunction means only *one* of the listed alternatives is required. *See*

*Houge v. Ford*, 44 Cal. 2d 706, 712 (1955) ("the function of the word 'or' is to mark an alternative such as 'either this or that'"); *Valdez v. Superior Court of San Bernardino Cty.*, No. E070656, 2019 WL 1236932, at *2 (Cal. Ct. App. Mar. 19, 2019) (rejecting argument that both factors needed to exist because of the choice of "the disjunctive word 'or' instead of the conjunctive word 'and' to connect the two factors, meaning, of course, that the presence of either factor alone is sufficient").[4] Further, reliance is not an element of this contract defense.

Although only one prong needs to be satisfied to meet the definition of Excluded Claim, in this case, Levandowski's misrepresentations and material omissions satisfy both prongs. *First*, as detailed above, Levandowski admits that he did not tell Stroz about his funding and control over Tyto even though he was asked directly to disclose all of his side businesses. In addition, he lied when he provided Uber with certifications that he had provided truthful and complete answers to Stroz' questions. *Second*, by not disclosing Tyto as an entity that he financed and controlled, Levandowski prevented Stroz from learning the significance of Tyto so that it could investigate his Tyto Misconduct when it searched the millions of documents imaged from his devices. Based on this evidence, the Tyto Misconduct constitutes an Excluded Claim under the Agreement and Uber has no contractual obligation to provide indemnity for that claim. Accordingly, the Court should rule against Levandowski and in favor of Uber on Affirmative Defenses 5 and 9 and Counterclaim IV.

## III. Any Indemnification That The Court Awards To Levandowski Should Be Less Than $5 Million.

According to Levandowski, even though he was engaged in the Tyto Misconduct for the entire disgorgement period of 44 months and only engaged in the Otto Misconduct for, at most, 4 months, all but $6,050,300 of Google's total judgment (or only 3.3%) should nonetheless be attributed to his Otto Misconduct. Levandowski's argument goes like this: (i) it is impossible to allocate as between the Otto and Tyto Misconduct during the time period in which this misconduct overlapped (September 30, 2015 through January 27, 2016); (ii) therefore, the Court should assume that Levandowski was

---

[4] The parol evidence makes even more clear that the parties intentionally chose the "either/or" construct. As originally drafted, Section 2.1(b)(ii) used the word "and" between subsections (A) and (B). Uber edited the provision to replace the conjunctive word "and" with the disjunctive language "either (A) ... or (B)" that appears in the final contract.

fired on September 29, 2015 and determine what he would have been entitled to receive under the Plan had he left Google on that date; and (iii) because he supposedly only would have been entitled to receive $6,050,300 of his deferred compensation on September 29, 2015, the Court should treat the balance of his deferred compensation (96.7%) as attributable solely to the four-month period when the Otto and Tyto Misconduct overlapped and find that it is entirely indemnifiable.

Each step of this argument fails for multiple reasons. For starters, it is possible to allocate between the Tyto and Otto Misconduct, a point this Court recognized when it denied Levandowski's summary judgment motion. [Dkt. 344, at 81-83.] One way to allocate is to compare the overall time period of each type of misconduct. The Tyto Misconduct occurred for 44 months; the Otto Misconduct for four months. Thus, 91.6% (44/48) of the total time of misconduct is attributable to Tyto Misconduct and 91.6% of the Award should be deemed an Excluded Claim.

Another means of allocation is to look at when the deferred compensation was actually *earned* as opposed to when it was *received*—as bankruptcy courts routinely do when considering whether deferred compensation and bonuses are part of the estate. *Rau v. Ryerson (In re Ryerson)*, 739 F.2d 1423, 1426 (9th Cir. 1984) (holding an employee's right to payment is property of the estate if based on pre-petition work, even if payment was at the company's option and would be due post-petition); *accord Parks v. Dittmar (In re Dittmar)*, 618 F.3d 1199, 1205 (10th Cir. 2010) (holding that debtor's interest in an equity participation plan was a pre-petition asset part of the bankruptcy estate and subject to creditor claims, even though the condition to payment occurred post-petition); *In re Gnadt*, No. 11-10378-BFK, 2015 WL 2194475, at *5 (Bankr. E.D. Va. May 7, 2015) (deferred compensation under an IRC 409A plan was property of the estate because debtor's rights vested based on pre-petition work).

21

[REDACTED]

Levandowski's second assumption—that the Court should measure what Levandowski might have been entitled to claim as deferred compensation if he had been terminated on September 29, 2015—proves too much. The premise of Levandowski's argument necessarily is that nothing he did in the first 40 months of his misconduct impacted his right to receive the deferred compensation Google paid to him. Thus, he urges the Court to measure what he would have received if he was terminated on September 29, 2015 when addressing how much of the deferred compensation is allocable to the Tyto Misconduct-only period. But if, as Levandowski argues, none of the 40 months of service in the Tyto-only time period is relevant to the deferred compensation Levandowski received, then the Court must measure what deferred compensation Levandowski would have received if he worked only from September 30, 2015 through January 27, 2016. The answer is indisputable: he would have received no deferred compensation and the only compensation subject to disgorgement would have been his salary. [REDACTED]

Put differently, even if Levandowski is entitled to full indemnification for the four months during which he committed both the excluded Tyto Misconduct and the indemnifiable Otto Misconduct, his indemnification should be limited solely to what he *earned* between September 30, 2015 and January 27, 2016. [REDACTED]

██████████████████████████████████████████ This argument suffers from the same equitable and legal flaws as his other allocation arguments.

Levandowski's "date of increase in value" argument also misapplies California law. "The general rule ... is that profits subject to disgorgement include any form of consequential gains or other secondary enrichment that is identifiable and measurable on the facts of the case and not unduly remote." *Uzyel v. Kadisha*, 188 Cal. App. 4th 866, 894 (2010) (internal citations and quotation marks omitted); *see also Meister v. Mensinger*, 230 Cal. App. 4th 381, 399 (disgorgement must include any "consequential gain[] that is identifiable and measurable and not unduly remote"); *Am. Master Lease LLC v. Idanta Partners, Ltd.,* 225 Cal App. 4th 1451, 1488-89 (2014) (erroneous to consider only the value of benefits at the time they were acquired, because restitution must include any later net profit attributable to the underlying wrong); *Cty. of San Bernardino v. Walsh,* 158 Cal. App. 4th 533, 543 (2007) (disgorgement extends to "all advantages ... gained"); *CTC Real Estate Servs. v. Lepe,* 140 Cal. App. 4th 856, 858 (2006) (disgorgement includes later earned profits from sale of wrongfully obtained property); Restatement (Second) of Agency § 403 ("If an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal."). Thus, under well-established California law, any later increase in value of the deferred compensation that vested during the Tyto Misconduct period is subject to disgorgement because of that misconduct and is an Excluded Claim.

Any other result would unjustly enrich Levandowski by allowing him to retain tens of millions

_____

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

Case: 20-03050   Doc# 404   Filed: 01/24/22   Entered: 01/24/22 21:05:13   Page 29 of 32

of dollars that he was never entitled to receive and evade the terms of the Agreement, thereby defeating the fundamental public policy limitations that disfavor private indemnification for misconduct.

## IV. Levandowski Owes Uber Over $270 Million In Fraud Damages That May Be Setoff Against Any Judgment (Affirmative Defense 10, Counterclaim VI).

Although the Court held that Uber could not recover affirmatively on its fraud claim, Uber is entitled to establish the claim for purposes of offsetting any judgment against it. [Dkt. 344, at 45-47.] Levandowski's fraud also makes Uber's Claim non-dischargeable. 11 U.S.C. § 523(a)(2)(A); (a)(4); (a)(6). The evidence establishes that Levandowski lied to Uber about his misappropriation of Google's confidential information. Uber justifiably relied upon those misrepresentations in providing indemnity and closing the Otto transaction. Uber repeatedly insisted that Levandowski not bring any Google IP with him, because it recognized that its entire program could be jeopardized if it were infected with improperly acquired IP. As a result of Levandowski's fraudulent concealment of his trade secret theft, the entire purpose of the Otto acquisition was defeated. As a result, Uber was damaged in the amount of $270,241,203.31 that may be set off against any judgment Levandowski obtains. *See All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) (setting forth elements of a fraud claim); *Labor Comm'r v. Ramirez (In re Ramirez)*, 556 B.R. 446, 451-52 (elements of § 523(a)(2)(A) claim); *Hamilton v. Elite of L.A., Inc. (In re Hamilton)*, 584 B.R. 310, 318-22 (B.A.P. 9th Cir. 2018) (elements of § 523(a)(6) claim).

## V. Uber's Proof of Claim Should Be Allowed And Setoff Against Any Judgment (Count X, Affirmative Defense 10, Counterclaims VII, IX, X).

Under California law, the right to equitable indemnity arises "where two or more parties are jointly liable on an obligation and one of them makes payment of more than his share." *Res-Care Inc. v. Roto-Rooter Servs. Co.*, 753 F. Supp. 2d 970, 986 (N.D. Cal. 2010) (internal citation omitted). The right to contribution can arise whether the payment is made pursuant to a final judgment or pursuant to a settlement where the settlement includes payment for a concurrent tortfeasor's wrongful conduct. *Id.*; *People ex rel. Dep't of Transp. v. Superior Court*, 26 Cal. 3d 744, 747 (1980).

There are two components to Uber's equitable indemnity claim. *First*, Uber is entitled to equitable indemnity from Levandowski because it paid $250 million to settle a lawsuit in which it was sued for what Levandowski did. As set forth above, all of the allegations in the Waymo lawsuit

24

centered around Levandowski and his misconduct. Uber's only share in the fault was that it failed to discover what Levandowski had done because of Levandowski's lies. Accordingly, a fair allocation would attribute all of the fault to Levandowski, and certainly no more than 10% to Uber.

The second component of Uber's claim is a contribution claim based upon the $9,453,135.87 that Uber paid to Google to satisfy the portions of the Award that were joint and several against Ron and Levandowski. (Award, 123.) Ron assigned his contribution claim to Uber. By definition, Levandowski was a joint tortfeasor as to the joint and several portions of the Award. (*See* Award, 101, 106, 112-13, 120-21, 123.) Because Uber paid that entire amount, and extinguished liability that applied to Levandowski, Uber is entitled to contribution from Levandowski for his share of that payment. *See Res-Care*, 753 F. Supp. 2d at 986.

The Arbitration Panel ruled that, as between Levandowski and Ron, "Levandowski's conduct occurred over a period of time three times longer than Ron's," and that much of the arbitration was focused on Levandowski's disloyalty with respect to Tyto, of which Ron was not a part. (Award, 120.) Further, Levandowski was the key wrongdoer here. Accordingly, Uber submits that Levandowski should be held liable for the full Award, but in any event, at least 80%, or $7,562,509.

Accordingly, Uber's proof of claim should be allowed in the amount of $232,562,509.00 and held to be non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).

## CONCLUSION

For the foregoing reasons and based on the facts Uber will prove at trial, Uber is entitled to judgment in its favor on all of Levandowski's claims and all of Uber's counterclaims and defenses.

Dated: January 24, 2022          PACHULSKI STANG ZIEHL & JONES LLP

By     */s/ Debra I. Grassgreen*
       Debra I. Grassgreen
       Miriam Manning
       --and—
       JENNER & BLOCK LLP
       David J. Bradford
       Terri L. Mascherin
       Catherine Steege
       Katharine R. McLaughlin

       *Counsel for Uber Technologies, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

STATE OF CALIFORNIA          )
                             )
CITY OF SAN FRANCISCO        )

     I, Oliver Carpio, am employed in the city of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is One Market Plaza, Spear Tower, 40th Floor, Suite 4000, San Francisco, California 94105.

     On January 24, 2022, I caused to be served the following documents in the manner stated below:

- **UBER TECHNOLOGIES, INC.'S TRIAL BRIEF**

| ☑ | (BY EMAIL) On, I caused the above-described document(s) to be sent by e-mail to the parties identified below at the e-mail addresses listed. |
|---|---|

| Attorneys for Google LLC | Attorneys for Anthony S. Levandowski |
|---|---|
| **MUNGER, TOLLES & OLSON LLP**<br>Thomas B. Walper (thomas.walper@mto.com)<br>John W. Berry (john.berry@mto.com)<br>Alexander S. Gorin (alex.gorin@mto.com) | **KELLER BENVENUTTI KIM LLP**<br>Tobias S. Keller (tkeller@kbkllp.com)<br>Dara L. Silveira (dsilveira@kbkllp.com) |
| **KEKER, VAN NEST & PETERS LLC**<br>Rachael E. Meny (rmeny@keker.com)<br>Thomas E. Gorman (tgorman@keker.com)<br>Reid P. Mullen (rmullen@keker.com | **GOODWIN PROCTER LLP**<br>Brett Schuman (bschuman@goodwinlaw.com)<br>Rachel M. Walsh (rwalsh@goodwinlaw.com)<br>Andrew Ong (aong@goodwinlaw.com) |

     I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

     Executed on January 24, 2022 at San Francisco, California

                */s/ Oliver Carpio* _____
                Legal Assistant